[No. G017944. Fourth Dist., Div. Three. Dec. 28, 1998.]

PATRICIA AKERS, Plaintiff and Appellant, v.
GERALD W. MILLER, Defendant and Respondent.

**COUNSEL**

Neal T. Curatola for Plaintiff and Appellant.

Hillsinger & Costanzo, Carol A. Salmacia and Roxanna Huddleston for Defendant and Respondent.

**OPINION**

**CROSBY, Acting P. J.**—This single-issue appeal challenges the court's refusal, in an elder abuse case against a nursing home physician, to admit photographs of an 89-year-old woman taken several days after she died. The plaintiff offered the photographs to show the condition of a severe bedsore.

There was no abuse of discretion by the trial court. The jury heard extensive testimony regarding the size and condition of the bedsore and how bedsores should be treated. The defense relied on expert testimony that the bedsore was the unavoidable result of decedent's poor physical condition and could not have been prevented even with reasonable medical care. The

photographs had no bearing on this central issue, and it is improbable that their admission or exclusion would have affected the verdict.

## I

Frances Doherty, born in 1902, suffered from the weaknesses of the elderly and multiple medical problems. By her 88th birthday, she was unable to eat, drink, or turn herself in bed, and had a catheter to drain her urine. Chronically bedridden and unable to communicate, she suffered from multiple bedsores and was moved back and forth from hospitals to nursing homes.

The decedent was hospitalized in the spring of 1991, and her relatives were told "that she probably would not last." Although she was subsequently discharged, her condition remained so grave that no Orange County nursing facility would accept her. Among other things, she had a large stage IV (the worst level) decubitus ulcer (bedsore) in the sacral coccyx area that was "responding slowly to treatment."

Doherty's daughter, plaintiff Patricia Akers, finally arranged to have her mother transferred in May 1991 to South Bay Nursing Center, a 192-bed skilled nursing center located near Long Beach. The stage IV bedsore was noted on the admission form.

Defendant Gerald W. Miller was South Bay's medical director. As Doherty's treating physician, he ordered her placed on an air-fluidized bed to manage her bedsore.

Doherty remained at South Bay until February 1992, when she was hospitalized for pneumonia at Woodruff, an acute care facility. She spent 14 of her last 19 days at Woodruff, unable to move and fed through a tube. She died on February 24, the same day she was transferred from Woodruff back to South Bay.[1]

Akers arranged for a private autopsy two days after the death. The pathologist determined the cause of death to be congestive heart failure. He noted a large decubitus ulcer in the mid-sacral area, about three and one-half inches in diameter, which penetrated to the bone.

Akers, as Doherty's sole surviving heir, sued South Bay, Woodruff, and Miller for medical malpractice. She also sought enhanced damages for

---

[1]Doherty's last three weeks were spent as follows: Woodruff, from February 6 to February 13; South Bay, from February 13 to February 18; Woodruff, from February 18 to February 24; South Bay, February 24.

attorney fees and for her mother's pain and suffering under California's elder abuse laws, which allow recovery against persons who maliciously or recklessly fail to provide reasonable medical care for an elderly or abused person under their care or custody. (Welf. & Inst. Code, §§ 15610.57, 15657; *ARA Living Centers - Pacific, Inc.* v. *Superior Court* (1993) 18 Cal.App.4th 1556 [23 Cal.Rptr.2d 224].)

Plaintiff called the pathologist as a trial witness and sought to introduce evidence of Polaroid photographs he took of the bedsore during the autopsy. The defense moved to exclude them on the ground of undue prejudice because tissue "markedly deteriorates" following death. The court determined the prejudicial impact of the photographs outweighed their probative effect: "But there is, as you know, a gross aspect of the picture. This is two days . . . after death. [¶] Well, there's a lot of discoloration that can happen in two days. It can happen in two hours, you know that. And I don't think these are fair to show. . . ." The judge concluded, "There is really nothing in those pictures that can't be detailed by a description. The only purpose of those pictures is to get people a little excited. And it outweighs any probative value that they have to offer."

Plaintiff's medical expert, Ron Teitelbaum, examined the autopsy photographs. He testified the bedsore could have been prevented by turning Doherty frequently, preferably every one to two hours, keeping her off her back, using hot packs and incandescent lamps, and cleaning it with a mild antiseptic every four hours or so. He opined that even a stage IV bedsore could be healed within four to six weeks, and placed blame squarely on Miller: "The buck stops with the doctor. He is responsible for the care of the patient. And it's his total responsibility. He is responsible for the nursing care."

Miller's experts, in contrast, testified, the bedsore was incurable: "But if you're wasting and malnourished and catabolic and you are dying, I won't be able to get [infected bedsores] away very long." There was evidence Doherty could not be turned because of problems with her feeding tube and her respiration, and that she suffered from a blistering skin disease and serum protein level so low as to make it physically impossible for the bedsore to heal. As was argued in closing, "[S]he had seen a number of nurses and doctors, any number of different facilities, hospitals. No one could cure it. And they couldn't cure it because of her overall medical condition. It was incurable. [¶] She had all of the medical factors that patients with [bedsores] have that make them incurable. She was chronically bedridden, disoriented, confused. . . . [¶] And her body didn't even have the capacity to deal with it on her own." Akers appeals from a unanimous jury verdict in favor of Miller.

## II

 Trial courts have "broad discretion" under Evidence Code section 352 to weigh the probative value of gruesome or inflammatory photographs against their prejudicial impact. Appellate courts will not disturb this determination on appeal unless one factor clearly outweighs the other. (*People* v. *Scheid* (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

One court went so far as to survey cases from "practically every jurisdiction of the United States and Canada dealing with admissibility of photographs of personal injuries," deciding that "[a]ll place determination of the question in the sound discretion of the trial court and most find no abuse." (*Twyford* v. *Weber* (Iowa 1974) 220 N.W.2d 919, 926-927.) Our canvas of case authority paints the same picture; the trial judge is in the best position to balance the competing interests under Evidence Code section 352. The same principles apply whether the debate is over the admission of gory photographs or, as here, their exclusion.

There was no abuse of discretion. While a picture might be worth a thousand words, the jury heard at least that many. The court permitted extensive testimony by the pathologist and plaintiff's experts regarding the condition of the bedsore as depicted in the photographs. If anything, the court's refusal to allow the jury to actually examine the photographs may have magnified (not diminished) the jury's belief that Doherty's bedsore was too grisly to be seen. Plaintiff's lawyer conceded the subjectivity of the court's decision: "I mean, we've already—I respect the court's ruling. We can't use the pictures. *I understand it's too inflammatory.*" (Italics added.)

Furthermore, we have reviewed the excluded autopsy photographs in the context of the evidence and testimony adduced at trial. The error (if any) was harmless because it is not reasonably probable a jury that maintained its objectivity would have reached a different result had the photographs been admitted. (*Beyda* v. *City of Los Angeles* (1998) 65 Cal.App.4th 511, 516 [76 Cal.Rptr.2d 547]; Evid. Code, § 354; Cal. Const., art. VI, § 13.) The trial turned on whether the bedsore was irremediable. As one defense doctor testified, "My opinion is that, given this entire complex of her chronic illnesse[s,] her debilitated state, which we've gone over, her bedridden state, her ulcers in my opinion could not be healed."

The jury heard conflicting expert evidence on this issue, and decided for the defense. The admission or rejection of the autopsy photographs would not have made any difference. There was no miscarriage of justice.

## III

Akers argues more relaxed rules of admissibility should apply in elder abuse cases because, as the Legislature has declared, "few civil cases are

brought in connection with this abuse due to problems of proof . . . ." (Welf. & Inst. Code, § 15600, subd. (h).) Yet the same legislation adopted a higher standard of fault (recklessness) and a heavier burden of proof (clear and convincing evidence) before enhanced damages like attorney fees may be imposed. Ultimately, as one court concluded, "[t]he statutes in issue here . . . do not make a 'substantial change in this state's traditional tort doctrine[]' . . . ." (*ARA Living Centers - Pacific, Inc.* v. *Superior Court, supra,* 18 Cal.App.4th at p. 1561.) In short, we do not find any legislative intent to reduce the trial court's discretion under Evidence Code section 352 to admit or exclude evidence based on its probative value and prejudicial effect.

Judgment affirmed. Costs on appeal are awarded to defendant.

Rylaarsdam, J., and Bedsworth, J., concurred.