[No. D047040. Fourth Dist., Div. One. Apr. 13, 2007.]

AUSTIN B., a minor, etc., et al., Plaintiffs and Appellants, v. ESCONDIDO UNION SCHOOL DISTRICT et al., Defendants and Respondents.

**COUNSEL**

Andrea R. Leavitt and Patricia A. Lewis for Plaintiffs and Appellants.

Stutz Artiano Shinoff & Holtz, Daniel R. Shinoff, Jack M. Sleeth, Jr., and Paul V. Carelli IV for Defendants and Respondents.

OPINION

**NARES, Acting P. J.**—In this action plaintiffs Austin B. and Jessica B. (together, plaintiffs), both of whom are minors who have a severe form of autism, allege that Shawn Tyler Priest, their preschool instructor in the Escondido Union School District (the District), engaged in abusive conduct against them while they were attending school.

We conclude on plaintiffs' battery claim that the court did not err by including in its jury instructions and special verdict form the requirements for a finding of liability that (a) Priest intended to harm plaintiffs, and (b) his touching of them was unreasonable, within the context of a teacher's role in controlling the conduct of students, particularly autistic or other special needs children.

We also conclude that the court did not err by (1) giving the jury a special verdict form on the negligence claim that did not ask if nondefendant employees of the District were negligent; (2) granting nonsuit on the battery claim as to the individual District employee defendants (other than Priest); (3) granting nonsuit on the Ralph Civil Rights Act of 1976 (Ralph Act) claim (Civ. Code, § 51.7); (4) granting nonsuit on the Tom Bane Civil Rights Act (Bane Act) claim (Civ. Code, § 52.1); (5) excluding evidence of other alleged misconduct by Priest as to other students; (6) denying plaintiffs' request to reopen their case prior to granting nonsuit; (7) awarding defendants attorney fees under Code of Civil Procedure section 1038; and (8) awarding defendants expert witness costs under Code of Civil Procedure section 998. Accordingly, we affirm the judgment and the orders.

## FACTUAL BACKGROUND

### A. *The Parties*

Austin and Jessica are both severely disabled with autism. In January 2000, at the age of three, Austin B. and Jessica B. entered the District's special education preschool program at the Nicolaysen Center. Austin B. was enrolled in a class taught by Priest. Jessica B. was enrolled in a similar class taught by Bettina Ayala.

Priest began working for the District teaching standard education and later began working in special education. Priest was required to take two additional years of education to receive a special education credential.

Janice Zelasko was the principal of Nicolaysen during the relevant time period. Zelasko's duties included assisting teachers in reaching their goals with the autistic students and ensuring that the students were safe. Robert Leon was the District's assistant superintendent of human resources. Claudia Boyle was the director of special education services. Michael Caston was the District's superintendent.

### B. *Austin's and Jessica's Disabilities*

As persons with severe autism, Austin's and Jessica's cognitive abilities are seriously impaired. Austin lost language skills at about age three. Jessica lost language skills at about 18 months. At age five, both children were functioning with mental ages under three years old. When they began preschool they exhibited many behaviors associated with autism: no verbal ability, biting themselves and others, head banging, "bolting" (i.e., running, escaping), chewing on inappropriate objects, repetitive motion conduct, and flinging themselves to the floor and thrashing.

Joni Atkins, a District occupational therapist who worked at the Nicolaysen Center, discussed the "deep pressure" and other touching techniques necessary to soothe autistic children in general, and Austin in particular. She testified that Austin "craved" pressure on his body.

According to Atkins, Austin and Jessica showed some signs of improvement at Nicolaysen. Austin's biting was decreasing and his attention to task improving. There was also improvement in Jessica's learning and behavior.

Austin's mother testified that if Austin was exhibiting any kind of biting or head banging or was harming himself or others, she might use a bear hug or a touch to a shoulder or to his arm in order to calm him down. This was always done in a calming, soft way. Jessica's mother also testified that holding her against her will was necessary to calm Jessica. Jessica's mother even swatted her on her behind on occasion.

### C. *November 2001 Report*

In early November 2001 staff member Pamela Hahn told Zelasko that she had concerns about Priest's conduct with children. Hahn did not identify the children involved and relayed a couple of general instances she had heard about, but did not describe the situation as abuse. Zelasko took the information from Hahn as "lots of hearsay of what other people were saying." Hahn did not give Zelasko the names of those persons who had concerns about Priest.

A few days later Zelasko told Priest it had come to her attention that staff members were beginning to become concerned about the manner in which he was handling children. She asked Priest about how he was lifting students because it was reported that he was being too rough lifting students and setting them down. She also conveyed to Priest a report that he was holding a child's thigh too tightly in order to keep the child sitting. Zelasko discussed better strategies for Priest to lift up a child using both hands with support under the arms, and they discussed his being vigilant about what could be misconstrued as too much pressure or force on his students.

According to Zelasko, Priest was very surprised, and he expressed concern that anything he had done would have been perceived as inappropriate. He was agreeable to her suggestions, seemed receptive and sincere in listening to her concerns, and he was adamant that he would be careful in how his actions could be perceived by others. After speaking to Priest, Zelasko increased the number of times she was in his room, she observed him when he did not know she was doing so, she walked into his classroom when his back was to her and he did not know she was there, she looked out the window and stood in the hallway as children were entering school, and she talked to Priest on several occasions about "how things were going." Between the November 2001 report and the end of January 2002, Zelasko did not receive any reports of misconduct by Priest from the other staff.

### D. *January-February 2002 Reports of Alleged Abuse*

At the end of January and the beginning of February 2002, Nicolaysen staff, including Ayala, Hahn, and Barbara Starr reported that Priest was engaging in abusive conduct when responding to his students' behaviors. They alleged that between November 2001 and February 2002 Priest engaged in actions that included bending a child's hand back to force the child to stand or sit, pinching a child, clinging to a child's hand so tightly to prevent the child from bolting that his own knuckles turned white, holding their wrists or hands while walking with them in a way that would cause discomfort if they attempted to escape, using too much pressure on a child's hand when the student was engaged in an activity such as coloring, applying unreasonable pressure on a child's neck, putting pressure on a child's shoulders to the point where the child would cry, stepping on children's fingers and feet, and tossing children through the air. Several of these alleged instances of abuse were reported to have been directed at Austin. One incident was reported as having been directed at Jessica when he was allegedly observed bending her hand back to force her to leave a room.

### E. *School's Response to Reports of Alleged Abuse*

Zelasko met with Priest to address the reports of alleged abuse. She counseled him to cease and desist any type of inappropriate behavior "if it had been going on," and she told him to confer with her every day about concerns he might have with students. Zelasko filed a report with child protective services alerting it to possible abuse of students by Priest.

### F. *Priest's Testimony Regarding His Actions*

At trial Priest denied harming any child at Nicolaysen Center. He denied inflicting pain on any student. He denied ever shaking a child.

As to Austin, he stated that he guided his hand through a coloring activity, but denied ever using pressure points to cause pain. Priest denied putting so much pressure on Austin's hand that his own knuckles turned white. Priest would place his hand on a child's shoulder or around their neck to "motor them through activities." Priest denied ever pinching Austin and testified that he never applied pressure to Austin to exert a response from him. He also testified he never stepped or stood on Austin's fingers. He denied ever bending Austin's wrist back. He admitted to putting his hand on Austin's thigh, but not applying force. He denied ever holding Austin above his head. He denied that Austin would flinch or cower when he approached Austin.

As to Jessica, he denied handling her in any way that caused injury to her. He denied picking up Jessica or Austin in a manner that compressed their diaphragms.

Priest explained that he did pinch Jessica, but only "as a gesture of what a pinch was" in order to teach her not to pinch other students. Jessica's mental age at the time was about 12 months. At the same time he pinched her, he told her, "No pinching." He did not leave a bruise on Jessica. Priest also admitted that he picked up Austin and threw him into a plastic ball pit, not to hurt him, but because Austin liked it. Austin was never hurt by the conduct. Priest admitted that he motored Austin through a stretching activity, but he did not physically force him through it.

Priest testified that the education of his students required touching, but that he never intentionally harmed any child. Priest stated that he would use physical approaches with children to help them pay attention to the task at hand and get them through an activity. He described in detail the deep pressure touching that was necessary to calm Austin. He would use heavy touching, hugs, and pressure on different parts of his body. Austin appeared to enjoy this. As part of Austin's "sensory diet" plan, there would be "touching;

partaking in different textures; different feeling things; wearing different textures; different textiles; different weights; participating in different environments; dealing with different parts of his body, such as rubbing specialized utensils on his lips and gums" because he had a "very narrow tolerance for some textures," it was "calming," and it would allow him to "participate more independently in his environment by widening the gap of things he was willing or able to do, to feel, and to touch, to smell, [to] taste."

At times he would put his hand on Austin's shoulder and squeeze it as part of the deep pressure technique. Although he would use firm pressure, he never did this with the intent to cause pain. This would cause Austin to disengage from what was distracting him and then engage in the task to which he should be paying attention. Austin would not cry when Priest did this, but did so when they began an activity in which he did not want to engage.

Priest also put pressure on Austin's thigh area. He did not do this with the intent to hurt Austin, but to get his attention. He would also have Austin wear a weighted vest, as it was calming to him. The vest would help him "focus and center by having the pressure on his body . . . it would call his attention to that pressure and perhaps filter out some of the other things that he was sensing at the time. And by filtering them out [it] would allow him to focus more precisely on tasks . . . ."

Priest also worked with Austin's parents to use the deep pressure or joint compression techniques when Austin was having tantrums at home. When his parents did so, it appeared to have some effect in calming Austin. Priest also used these techniques when Austin arrived at school, and he would hold Austin when he was leaving with his parents in the evening until he calmed down.

Priest did not use deep pressure techniques on Jessica, as he did not interact with her much. Priest was not on Jessica's "team."

G. *Testimony of Emilia Velasco*

Emilia Velasco was a teacher's aide who worked with Priest for a year while Austin was in his class. She testified Austin liked sensory touching a lot. Velasco never saw Priest slam Austin down onto any surface, step on Austin's hand, grab Austin and lift him above his head, bend Austin's hand back, pinch Austin around the neck, or hurt Jessica in any way. She had no concerns about Priest doing something inappropriate with his students.

## PROCEDURAL BACKGROUND

Plaintiffs filed separate but largely identical lawsuits that were consolidated by the superior court for discovery and trial. The original complaints alleged causes of action against defendants for (1) violation of section 1983 of title 42 of the United States Code; (2) violation of the Unruh Civil Rights Act (Civ. Code, § 51); (3) violation of the Bane Act (Civ. Code, § 52.1); (4) violation of the Ralph Act (Civ. Code, § 51.7); (5) violation of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.); (6) violation of section 504 of the Rehabilitation Act of 1973; and (7) negligence. The complaints were later deemed amended to add an eighth cause of action for battery against all defendants.

After the court partially granted defendants' motion for summary judgment or summary adjudication of issues, the case proceeded to trial only on the causes of action for battery, negligence, and violation of the Unruh Civil Rights Act. During trial it was clarified that plaintiffs' claims under the Unruh Civil Rights Act were actually claims being brought under the Bane Act, which prohibits "threats, intimidation, or coercion" designed to prevent a person's exercise or enjoyment of their constitutional or statutory rights (Civ. Code, § 52.1), and the Ralph Act, which declares that all persons have the right to be free from violence or intimidation because of their disabilities. (Civ. Code, § 51.7.)

Following plaintiffs' case-in-chief, the court granted defendants' motion for nonsuit as to the Ralph Act and the Bane Act claims and also granted a motion for nonsuit as to the battery claim against the individual defendants, with the exception of Priest.

The claim for battery as against Priest and negligence against all defendants proceeded to verdict. The jury returned a unanimous verdict in favor of defendants on each cause of action.

In responding to the first question on the special verdict form on battery, the jury found that Priest did not touch Austin or Jessica with the intent to harm or offend. On the negligence claim, the jury found that none of the individual defendants was negligent with respect to either Austin or Jessica.

The District moved for recovery of attorney fees incurred in defending the Ralph Act and Bane Act claims under Code of Civil Procedure section 1038, which allows a public entity to recover attorney fees from plaintiffs who file a frivolous action, where the defendant obtains dismissal by summary judgment, directed verdict or nonsuit. The court granted the motion, awarding the District $24,982.76 in attorney fees. The court also awarded defendants their costs, including expert witness fees under Code of Civil Procedure section 998.

Plaintiffs also appealed from the judgment and from the orders awarding attorney fees and costs.

## DISCUSSION

### I. *INSTRUCTIONS AND SPECIAL VERDICT FORM ON BATTERY*

Plaintiffs contend that the court erred in its jury instructions and special verdict form on battery because (1) both the jury instructions and special verdict form required them to prove as an element of battery that Priest's touching of Austin and Jessica was unreasonable; and (2) the special verdict form also required the jury to find that Priest intended to harm or offend plaintiffs. We conclude that, within the context of a teacher's role in controlling the conduct of students, particularly autistic or other special needs children, the instructions and special verdict form were not erroneous.

#### A. *Background*

The court instructed the jury on the elements of battery under a modified version of the Judicial Council of California Civil Jury Instructions (2003–2004) CACI No. 1300 (Battery): "Each plaintiff claims that defendant, Shawn Priest, committed a battery. To establish this claim, each plaintiff must prove all of the following: [¶] 1. *That defendant, Shawn Priest, intended to touch the Plaintiff*; [¶] 2. That defendant, Shawn Priest, touched the plaintiff; and [¶] 3. That the plaintiff was harmed or offended by defendant, Shawn Priest's conduct; [¶] and [¶] 4. *That the touching was unreasonable.*" (Italics added.)

Next the jury was given CACI No. 1320 (Intent), as follows: "Defendant, Shawn Priest, acted intentionally if he intended to commit a battery or if he was substantially certain that a battery would result from his conduct."

The special verdict forms that the court used for Austin and Jessica were modified versions of CACI Verdict Form No. 1300 (Battery) (VF-1300), which, in their original form asked whether Priest intended to "harm or offend" Austin and Jessica, and which added the question whether Priest's touching was unreasonable:

"Question No. 1: Did Shawn Priest touch [Austin/Jessica] with *the intent to harm or offend him*? [¶] . . . [¶]

"Question No. 2: *Was the touching reasonable under the circumstances*? [¶] . . . [¶]

"Question No. 3: Was [Austin/Jessica] harmed by the touching?" (Italics added.)

The jury answered question No. 1 "[n]o" as to both Austin and Jessica and therefore did not answer the remaining two questions.

### B. *Standard of Review*

The standard of review for alleged instructional error is the prejudicial error standard. (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1459–1460 [116 Cal.Rptr.2d 602].) Similarly, the adequacy of the special verdict form is reviewed for prejudicial error. (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 938–939 [268 Cal.Rptr. 609].) Under this standard, the judgment must be affirmed unless the appellant can show an error that was so prejudicial a miscarriage of justice occurred. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

### C. *Analysis*

■ Plaintiffs first assert that the special verdict form on the battery cause of action was erroneous because an intent to harm is not at issue where the touching is nonconsensual or otherwise unlawful. They also assert that the court's instruction that the touching must be unreasonable in order to find battery, and the addition to the special verdict form of this element was error. These contentions are unavailing.

■ Restatement Second of Torts, section 13 provides: "An actor is subject to liability to another for battery if [¶] (a) he acts *intending to cause a harmful or offensive contact* with the person of the other or a third person, or an imminent apprehension of such a contact, and [¶] (b) a harmful contact with the person of the other directly or indirectly results." (Italics added.)

Relying in part on section 13 of the Restatement Second of Torts, CACI No. 1300, defining the elements of battery, and VF-1300, the CACI special verdict form for battery, both require that there be an "intent to harm or offend" the victim. (See coms. to CACI No. 1300 & VF-1300.) Therefore, in the ordinary case it is appropriate and, indeed *required*, that the jury be instructed that to be liable for battery, a defendant must intend to harm or offend the victim.

Relying on *Lopez v. Surchia* (1952) 112 Cal.App.2d 314 [246 P.2d 111] (*Lopez*), plaintiffs assert that intent to harm is not an element of battery in this case because the touching was unlawful as (1) it was not consented to

because plaintiffs did not have the mental capacity to consent; and (2) the touching violated California law.

In *Lopez,* the defendant's son was fighting with a trespasser on the defendant's property. The defendant shot his gun in the direction of the fighting, but missed, hitting the trespasser's friend who was nearby. (*Lopez, supra,* 112 Cal.App.2d at p. 316.) The friend sued the defendant for battery. The court concluded that the plaintiff need not show an intent to harm because the firing of the gun was an unlawful act. Because the act was unlawful, all that was necessary was for the plaintiff to show an intent to do the act, i.e., fire the gun. (*Id.* at p. 318.)

However, this case is distinguishable from *Lopez* because, as we shall discuss, *post,* teaching autistic children by touching and guiding them is not unlawful, and students, by attending school, consent to some touching necessary to control them and protect both their safety and the safety of others. Indeed, plaintiffs did not contend at trial that Priest could not touch them at all. Rather, they argued that some of the touching exceeded what was proper and constituted child abuse. Because we are presented with the unique situation of a teacher-pupil setting, where it is undisputed that some touching was necessary to control and guide those students, both an intent to harm and the reasonableness of the touching were at issue and the instructions and special verdict form on battery were not erroneous.

The Restatement Second of Torts, section 147 provides: "(1) A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his child as he reasonably believes to be necessary for its proper control, training, or education. [¶] (2) *One other than a parent who has been given by law or has voluntarily assumed in whole or in part the function of controlling, training, or educating a child, is privileged to apply such reasonable force or to impose such reasonable confinement as he reasonably believes to be necessary for its proper control, training, or education,* except in so far as the parent has restricted the privilege of one to whom he has entrusted the child." (Italics added.)

Comment f to subsection 2 provides that this privilege applies to public school teachers: "The rule stated in this Section applies to *any person other than a parent who is exercising the parental function of controlling, training, and educating a child.* It applies to persons to whom the law has given complete or partial charge of such matters. *Thus, it includes* a guardian appointed by a court to take charge of the person of the child, the officers of a state orphanage or reformatory home, *the teachers and other officials in a public school to which the parent is required to send his child for education,*

and one to whom the child is bound by poor guardians or some other public body authorized so to do." (Rest.2d Torts, § 147, com. f, p. 267, italics added.)

Although this Restatement section has not been specifically adopted in this state by statute to provide such a privilege to school teachers in civil actions for battery, it does find recognition in Education Code[1] section 44807, which provides such a privilege in criminal prosecutions for battery: "Every teacher in the public schools shall hold pupils to a strict account for their conduct . . . . A teacher . . . shall not be subject to criminal prosecution or criminal penalties for the exercise, during the performance of his duties, of *the same degree of physical control over a pupil that a parent would be legally privileged to exercise but which in no event shall exceed the amount of physical control reasonably necessary to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning.* The provisions of this section are in addition to and do not supersede the provisions of Section 49000." (Italics added.)

█ Moreover, our Supreme Court has recognized the common law rule of "*in loco parentis,*" and section 44807's codification of that rule, in a case involving school officials' liability for a nonstudent's injuries resulting from the actions of a student off campus: "The relationship between school personnel and students is analogous in many ways to the relationship between parents and their children. At common law, '[s]chool officials are said to stand *in loco parentis,* in the place of parents, to their students, with similar powers and responsibilities. [Citation.]' [Citation.] Moreover, by statute, we measure school personnel's criminal liability for exercising physical control over students by the standard applicable to parents. ([§] 44807.) Given these similarities, any duty that school employees owe off-campus nonstudents should *at least* be no greater in scope than the duty that parents owe third persons." (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 935–936 [80 Cal.Rptr.2d 811, 968 P.2d 522], fn. omitted.)

Because this state recognizes that, both under the common law and by statute, in a school setting a teacher stands in loco parentis to his or her students, the teacher may maintain that degree of control over a student that is "reasonably necessary to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning." (§ 44807.) This is particularly true where, as here, the students are autistic children who admittedly need, and in some circumstances desire, touching to calm, guide and control them. If the reasonableness of the touching were eliminated as an element of battery in such circumstances, that

---

[1] All further statutory references are to the Education Code unless otherwise specified.

could lead to a form of strict liability for battery as to special education teachers who engage in therapeutic touching of students. The court did not err in requiring that the jury find that Priest's touching be unreasonable.

Nor did the court err in utilizing the standard CACI special verdict form that asked the jury whether Priest intended to harm or offend plaintiffs. As Education Code section 44807 and section 147 of the Restatement Second of Torts provide, if the touching was reasonably necessary, it was not "unlawful," and therefore the rule laid out in *Lopez, supra,* 112 Cal.App.2d 314 is inapplicable. Moreover, it is not correct, as plaintiffs argue, that plaintiffs were incapable of consenting to being touched because of their disabilities. Their parents, by enrolling them in school, consented to their teachers assuming the role of standing in loco parentis as to plaintiffs, including consent to reasonable touching necessary to guide and control them in the school environment.

In support of their contention that Priest's actions were unlawful, plaintiffs rely on this state's ban on corporal punishment, codified in section 49001, which provides: "(a) For the purposes of this section 'corporal punishment' means the *willful infliction of, or willfully causing the infliction of, physical pain on a pupil. An amount of force that is reasonable and necessary for a person employed by or engaged in a public school to quell a disturbance threatening physical injury to persons or damage to property, for purposes of self-defense, or to obtain possession of weapons or other dangerous objects within the control of the pupil, is not and shall not be construed to be corporal punishment within the meaning and intent of this section.* Physical pain or discomfort caused by athletic competition or other such recreational activity, voluntarily engaged in by the pupil, is not and shall not be construed to be corporal punishment within the meaning and intent of this section. [¶] (b) *No person employed by or engaged in a public school shall inflict, or cause to be inflicted corporal punishment upon a pupil.* Every resolution, bylaw, rule, ordinance, or other act or authority permitting or authorizing the infliction of corporal punishment upon a pupil attending a public school is void and unenforceable." (Italics added.)

This code section does not support plaintiffs' position. As the statute specifies, to be considered corporal punishment, the teacher must *willfully* inflict physical pain. This is consistent with an instruction that Priest intended to cause harm or offense.

Thus, as long as the touching was not "unreasonable" and did not amount to a "willful infliction of physical pain," it would not be unlawful.

Moreover, the court did give the jury an instruction that (1) provided the definition of corporal punishment contained in section 49001; and (2) stated

that no teachers in public schools were allowed to inflict corporal punishment on students. Therefore, plaintiffs were free to argue to the jury that Priest "willfully inflicted pain" on them, satisfying the intent to harm element, and that because it constituted corporal punishment, the touching was also unreasonable.

Plaintiffs, in their briefs and at oral argument, assert that because the evidence at trial concerning Priest's conduct demonstrated that his actions were unlawful *as a matter of law*, the court could not place an intent to harm element in the special verdict form. However, our review of the record shows that the evidence was in sharp dispute over the propriety of Priest's actions, and he vehemently denied any wrongdoing. Moreover, following oral argument we requested further briefing from the parties, asking whether appellants ever moved for a directed verdict (or brought any other motion) at trial requesting a finding that Priest's conduct was unlawful as a matter of law. The further briefing and our own review of the record confirms that plaintiffs made no such request.

Further, given the conflicts in the evidence concerning Priest's conduct, if plaintiffs wanted the jury to resolve the issue of the lawfulness of Priest's conduct they should have proposed a special verdict form that (1) in the first question asked if Priest's conduct was unlawful (i.e., that it constituted prohibited corporal punishment); and (2) instructed the jury that if their answer to that question was in the affirmative, they need not answer the question whether Priest intended to harm plaintiffs. However, the only special verdict form proposed by plaintiffs was one that simply asked whether Priest (1) committed a battery on plaintiffs; and (2) if plaintiffs suffered any harm as a result of the battery.

Finally, even assuming the instruction and/or special verdict form on battery were in any way erroneous, the error was not prejudicial. The jury found in favor of Priest on plaintiffs' negligence claim. Because they were only required to find that Priest failed to use "reasonable care" to prevent harm to plaintiffs in order to find him liable on that claim (see CACI No. 401), it is not reasonably likely that the jury would have found him liable for the intentional tort of battery but for the alleged errors in the battery instructions and special verdict forms.

## II. *SPECIAL VERDICT FORM ON NEGLIGENCE*

Plaintiffs contend the court erred in failing to include on the negligence portion of the special verdict form the instruction that if any District employee was negligent, the District was negligent. Specifically, plaintiffs assert this question was necessary "because the Defendants adopted the

position that the other nondefendant teachers (Hahn, and Ayala, who had left the District by the time of trial, and Starr, who became [a] substitute teacher) were at fault for not having reported to law enforcement the suspected child abuse of [plaintiffs], and the District was not responsible for those teachers' negligent failure to make law enforcement reports as required under California Penal Code [section] 11166." We reject this contention

### A. *Background*

On their negligence claim, plaintiffs requested a special verdict form that, in addition to asking the jury to decide if any of the named defendants were negligent, also asked whether "[a]ny other employee of [the District], including but not limited to Pamela Hahn, Barbara Starr, Bettina Ayala or any aide" was negligent. The court refused that special verdict form and instead gave one that only asked the jury, in question No. 4, if any of the named defendants were negligent. The next question, question No. 5, on both the given and refused special verdict forms, told the jury: "If you answered 'yes' to any of the persons in question [No.] 4, you are required to find [t]hat [the District] was negligent. But, if you did not check 'YES' to any of the persons in question [No.] '4', check 'NO' to the right." The jury checked "No" in question No. 4 as to each named defendant. Accordingly, the jury also checked "No" for question No. 5 as to the District's liability.

In arguing for inclusion in the special verdict forms of questioning not just if the named employee defendants were negligent, but also whether three other nondefendant employees, as well as "any other employee of the District," were negligent, plaintiffs' counsel stated to the court: "You [the trial court] took out the jury instruction that I wanted that says, 'If it is attributed to any other employee you must find the [District negligent] because they are responsible.' [¶] . . . [¶] Your Honor, I think to do it that way would invite error. Here is the reason. *Because if they are blaming other employees like Hahn, Starr,* . . . [t]he law is very specific—there is a jury instruction on it; you took that jury instruction out—if any employee acting within their course and scope [were] negligent . . . ." (Italics added.)

The court then asked defense counsel, "Is that what you are going to argue?" Defense counsel responded, "Absolutely not." Later, defense counsel stated, "We are not going to blame Ms. Starr, Ms. Ayala, or Ms. Hahn." The trial court then asked, "Are you going to make an argument that *any* employee of the defendants [is] potentially at fault?" (Italics added.) The District's counsel answered, "No." Thereafter, defendants did not argue to the jury during closing argument that any employee not named as a defendant was negligent.

B. *Analysis*

Government Code section 815.2, subdivision (a) provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee . . . ."

Plaintiffs assert that the court erred in its instruction on negligence by omitting language that the District was responsible for the negligence of District employees not named as defendants because "the trial court's ruling gave the Respondents the green light to blame the nondefendant teachers . . . for reporting up the [District] hierarchical chain . . . rather than having made the suspected child abuse reports to law enforcement . . . the proverbial empty chair defense . . . ." However, as detailed, *ante*, respondents did *not* argue in closing argument that nondefendant employees were negligent. Indeed, plaintiffs make no citation to the record in support of this assertion. Accordingly, the court did not err in refusing to instruct the jury that if nondefendant employees of the District were negligent, the District was also negligent.

### III. *GRANT OF NONSUIT ON BATTERY CLAIM*

Plaintiffs assert that the court erred in granting a nonsuit on behalf of District employees Caston, Leon, Boyle and Zelasko because they were joint tortfeasors that aided and abetted Priest in his battery of Austin and Jessica. We reject this contention.

A. *Background*

After plaintiffs completed their case-in-chief, respondents brought a motion for nonsuit, seeking to dismiss the battery claim as against all defendants, with the exception of Priest and the District. They argued that there was no evidence that Caston, Leon, Boyle or Zelasko committed a battery upon Austin or Jessica. The court granted the motion.

B. *Standard of Review*

The grant of a motion for nonsuit may not be upheld on appeal unless " ' " ' "interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " ' " (*Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1266 [132 Cal.Rptr.2d 855].)

C. *Analysis*

Plaintiffs do not claim that any of the employee defendants other than Priest personally committed a battery upon Austin or Jessica. Rather, they claim that these defendants "were joint tortfeasors with liability for battery because they enabled, permitted, [and] assisted [Priest] in battering the children." This contention is unavailing as there is no substantial evidence the employee defendants aided and abetted Priest's actions.

■ "California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort. ' "Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." [Citations.]' [Citation.]" (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144 [26 Cal.Rptr.3d 401]; see also *River Colony Estates General Partnership v. Bayview Financial Trading* (S.D.Cal. 2003) 287 F.Supp.2d 1213, 1225 ["A party can be liable for aiding and abetting an intentional tort if . . . an individual is aware that the other's conduct constitutes a breach of duty and provides substantial assistance or encouragement to the other to so act"].)

"Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting. [Citation.] 'As a general rule, one owes no duty to control the conduct of another . . . .' [Citations.] More specifically, a supervisor is not liable to third parties for the acts of his or her subordinates." (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1326 [58 Cal.Rptr.2d 308].)

Here, the evidence of the individual employees' actions amounts at most to a showing that they had knowledge of Priest's allegedly tortious conduct and failed to take action to prevent it. Plaintiffs merely point to evidence that these defendants were informed of the alleged abuse of plaintiffs and did not remove him from his position or otherwise protect them from abuse. There is no evidence that these employees aided and abetted Priest by giving "substantial assistance or encouragement" in his alleged acts of battery. There was no evidence that they intentionally participated in his actions with the knowledge of what he intended. The court did not err in granting a nonsuit on the battery claims alleged against Caston, Leon, Boyle, and Zelasko.

## IV. *GRANT OF NONSUIT ON RALPH ACT CLAIM*

Plaintiffs assert that the court erred in granting a nonsuit on their Ralph Act (Civ. Code, § 51.7) claim because there is substantial evidence that they were exposed to violence or intimidation because of their age or disability. We reject this contention.

### A. *Background*

Defendants brought a motion for nonsuit against plaintiffs' Ralph Act claim, arguing that there was no evidence of intentional discrimination against Austin and Jessica or that the motivating reason for the alleged battery was their disability or age. Plaintiffs argued in opposition that the evidence inferred that Priest only committed the alleged battery because the victims were nonverbal autistic children who could not complain.

For purposes of ruling on the motion, the court assumed that plaintiffs had proven that Priest "grabbed, yanked, compressed, stepped on" and "slammed down" Austin and Jessica, "using pain to get compliance." However, the court granted the motion, finding that there was insufficient evidence to support a finding that "the motivating reasons for the acts [were] discriminatory in nature because of the minor[s'] disability or age."

### B. *Analysis*

The Ralph Act, codified in Civil Code section 51.7, provides: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of [Civil Code s]ection 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive."

Civil Code section 51, subdivision (b) provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability*, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Italics added.)

CACI No. 3023 sets forth the elements of a Ralph Act claim: "1. That [the defendant] threatened or committed violent acts against [the plaintiff or his or

her property]; [¶] 2. That *a motivating reason for [the defendant's] conduct was* [[his/her] perception of [*the plaintiff's age or disability*]]; [¶] 3. That [the plaintiff] was harmed; and [¶] 4. That [the defendant's] conduct was a substantial factor in causing [the plaintiff] harm." (Italics added.)

In support of their contention that the court erred in granting a nonsuit on this claim plaintiffs point to evidence that they argue, taken in the light most favorable to their position, showed (1) the conduct by Priest was to intimidate and coerce the children, (2) the conduct was directed at children satisfying the age requirement, and (3) it was directed at disabled individuals. However, plaintiffs point to no evidence creating even an inference that Priest's *motivation* in allegedly abusing Austin and Jessica was the fact that they were disabled children. In other words, there was no evidence that he took the alleged actions because he was biased against or had an animus against disabled children. The court therefore did not err in granting nonsuit on the Ralph Act claim.

## V. GRANT OF NONSUIT ON BANE ACT CLAIM

Plaintiffs assert that the court erred in granting nonsuit on their Bane Act (Civ. Code, § 52.1) claim as substantial evidence showed that their exercise and enjoyment of their constitutional right to a public education was interfered with by threats, intimidation or coercion. This contention is unavailing.

### A. Background

Defendants brought a motion for nonsuit on plaintiffs' Bane Act claim, arguing that there was no evidence presented at trial that their exercise of their right to a public education was interfered with by threats, intimidation or coercion. In opposition to this motion, plaintiffs argued that Priest's acts constituted intimidation or coercion, that he need not have had a discriminatory motivation, and that he interfered with plaintiffs' exercise and enjoyment of going to school.

The court granted the motion, finding that at most the evidence showed that Priest was "wrongfully using pain to gain compliance or, perhaps, out of anger or frustration," and there was no substantial evidence to support a finding that alleged acts of defendants "were intended to interfere with the [plaintiff's] rights or that [plaintiffs] were coerced into not exercising their civil rights."

### B. Analysis

Civil Code section 52.1 provides in part: "(a) If a person or persons, whether or not acting under color of law, *interferes by threats, intimidation,*

*or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state,* the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . . [¶] *(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages* . . . ." (Italics added.)

The elements of a cause of action under Civil Code section 52.1 are stated in CACI No. 3025: "1. That [the defendant] interfered with [or attempted to interfere with] [the plaintiff's] [constitutional or statutory right] by threatening or committing violent acts; [¶] 2. [That [the plaintiff] reasonably believed that if [he/she] exercised [his/her] [constitutional] right [the defendant] would commit violence against [him/her] or [his/her] property;] [¶] [That [the defendant] injured [the plaintiff] or [his/her] property to prevent [him/her] from exercising [his/her] [constitutional] right or retaliate against [the plaintiff] for having exercised [his/her] [constitutional] right;] [¶] 3. That [the plaintiff] was harmed; and [¶] 4. That [the defendant's] conduct was a substantial factor in causing [the plaintiff's] harm."

The constitutional right allegedly interfered with here is the right to a free public education, embodied in California Constitution, article IX, section 5, which provides: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established."

■ "The Legislature enacted [Civil Code] section 52.1 to stem a tide of hate crimes." (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844, 949 P.2d 941] (*Jones*).) Civil Code section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion." (*Jones, supra*, 17 Cal.4th at p. 334.) To obtain relief under Civil Code section 52.1, a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion. (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 841–843 [11 Cal.Rptr.3d 692, 87 P.3d 1].)

The word "interferes" as used in the Bane Act means "violates." (See *Jones, supra,* 17 Cal.4th at p. 338 [California Supreme Court equates "interfere" with "violate"]; *City of Simi Valley v. Superior Court* (2003) 111 Cal.App.4th 1077 [4 Cal.Rptr.3d 468] [same].) The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion"), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law. (*Jones, supra,* 17 Cal.4th at p. 334.)

Here, there is no evidence presented that the actions of Priest caused (1) Austin and Jessica not to attend school or (2) that he attempted to achieve this result. While there was sufficient evidence to send the issue to the jury as to whether he committed a battery on plaintiffs, there is no evidence of acts that could be construed as threats, violence or intimidation that actually caused a loss of their right to an education or that attempted to do so. The court did not err in granting a nonsuit on the Banes Act claim.

## VI. EXCLUSION OF EVIDENCE OF ALLEGED ABUSE OF OTHER STUDENTS

Plaintiffs assert that the court erred by excluding, in limine, evidence of Priest's alleged abuse of other children in his classroom. We reject this contention.

### A. Background

Defendants moved in limine for an order excluding evidence of alleged misconduct of Priest on other occasions involving other students. Counsel for plaintiffs argued that this evidence showed a pattern and practice by Priest and was relevant to establish plaintiffs' Bane Act claim. Specifically, she argued that plaintiffs' witnessing of abuse of other students could demonstrate the intimidation or coercion necessary to prove that claim.

The trial court analyzed the motion under Evidence Code section 352, weighing the relevance of the proffered evidence against its potential for prejudice. The court did not entirely exclude the evidence of other acts, but instead ruled that alleged misconduct on prior occasions would be admissible if highly probative so that it would overcome any prejudice; evidence showing the intent or motive of Priest, and would be "limited to acts that took place in the presence of Austin and Jessica and were made known to the other defendants." The court excluded one item of evidence, that a nonparty student was forced by Priest to keep regurgitated vomit in his mouth, on the basis that its prejudice outweighed its relevance.

During trial, the court was presented with evidence plaintiffs sought to introduce that an instructional aide, Ms. Munoz, saw Priest "force-feeding" another student. The court again explained that there were two conditions on admission of the evidence: "One, that it be in the presence of the plaintiffs. The other, that it be . . . information . . . given to the defendants. Or that notice of those incidences [sic] were given to the defendants."

Later in the trial, plaintiffs again addressed the court as to evidence of alleged misconduct by Priest directed at other students. The court again reiterated that evidence of misconduct with other children would be permitted for the limited purpose "to show intent or motive of [Priest] and conduct with [the students]" or to "show plan or knowledge of utilizing certain behavioral techniques absent of mistake or accident. And notice to the defendants in their knowledge of the allegations of abuse." The court also permitted evidence of incidents involving nonparty minors for the additional, limited purpose of proving a discriminatory motive under the Ralph Act.

The court also gave a limiting instruction to the jury, stating that the jury could consider evidence of instances with children other than Austin and Jessica "only for the limited purpose of determining [Priest's] motive, intent, plan, or absence of mistake in his conduct with Austin or Jessica. [¶] You may also consider this evidence to show the school district's knowledge of allegations of abuse by [Priest]."

Later in the trial, the issue arose once again. Restating its in limine ruling, the court explained: "Any former in limine ruling with respect to conduct with nonparty minors was that it is prohibited by the evidence. It is permissible if it is for different purposes other than for propensity. [¶] I have indicated to you what the purposes may be. Motive is one of the permitted purposes. However, it does continue—these incidences [sic] do need to continue to meet the other requirements. They have to be present, have to have been in the presence of the minors and defendant."

Counsel for plaintiffs argued that because discriminatory motive was now expressly stated by the court to be a legitimate purpose to permit the evidence, it should not matter whether or not the acts occurred in the presence of plaintiffs. The trial court agreed that "[t]hings may have changed."

The court then asked plaintiffs' counsel for an offer of proof, with specificity, of the incidents they sought to introduce. Counsel deferred on making an offer of proof, stating, "[W]e are going to handpick out the ones that were testified to as the witnesses were present. And with respect to that, we will try to get an answer."

Later, Boyle was asked whether she had been informed that Priest was force-feeding a student. The court would not permit the question of that witness at that time, without first having a foundation established that the force-feeding had actually occurred. Plaintiffs, however, never attempted to lay such a foundation.

## B. *Standard of Review*

We review a trial court's decision to admit or exclude evidence under the abuse of discretion standard. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) This standard of review applies where, as here, there is a contention that evidence was erroneously excluded under Evidence Code section 352 because it caused undue consumption of time, undue prejudice, confusion of the issues, or misleading of the jury. (*Akers v. Miller* (1998) 68 Cal.App.4th 1143, 1147 [80 Cal.Rptr.2d 857].)

## C. *Analysis*

■ "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) An exception to this rule lies where, "a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

In addition, courts weigh whether to admit evidence under Evidence Code section 1101, subdivision (b) by looking to Evidence Code section 352, which provides in part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'Prejudic[ial]' in Evidence Code section 352 does not mean 'damaging' to a party's case, it means evoking an emotional response that has very little to do with the issue on which the evidence is offered. [Citation.] Evidence which has probative value must be excluded under [Evidence Code] section 352 only if it is 'undu[ly]' prejudicial despite its legitimate probative value." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 597 [103 Cal.Rptr.2d 492].)

Here, plaintiffs' contention that the court erred in excluding evidence of other alleged acts of misconduct fails because the court, contrary to plaintiffs'

claim, did allow evidence of other instances of misconduct. Although permitted to introduce certain of these instances, plaintiffs failed to make an offer of proof that such episodes occurred. The failure to make a specific offer of proof constitutes waiver of a contention that the court erroneously excluded evidence. (Evid. Code, § 354; *In re Mark C.* (1992) 7 Cal.App.4th 433, 444 [8 Cal.Rptr.2d 856].)

Moreover, as to Priest's alleged act of force-feeding another student, while the court initially indicated that it was excluding this incident as overly prejudicial, it later ruled that the evidence could be admitted if a proper foundation were laid. Plaintiffs never laid such a foundation. Thus, the court did not erroneously exclude evidence of other instances of misconduct.

## VII. COURT'S REFUSAL TO ALLOW PLAINTIFFS TO REOPEN THEIR CASE

Plaintiffs assert that the court erred in denying their motion to reopen their case-in-chief before granting defendants' motion for nonsuit. We reject this contention.

### A. *Background*

After defendants moved for nonsuit, plaintiffs filed a written response to the motion, which included a motion to reopen their case. However, plaintiffs' written opposition only cited evidence that had previously been presented, not further evidence they intended to submit if the case was reopened.

### B. *Standard of Review*

The denial of a motion to reopen a case for further evidence "rests upon the sound discretion of the trial court." (*Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776, 793 [172 Cal.Rptr. 342].) "That discretion should not be overturned on appeal absent a clear showing of abuse." (*Ibid.*)

### C. · *Analysis*

In response to a motion for nonsuit, a plaintiff has the right, upon request, to reopen its case to remedy defects raised by the nonsuit motion. (*Eatwell v. Beck* (1953) 41 Cal.2d 128, 131–132 [257 P.2d 643]; *S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 538 [30 Cal.Rptr.2d 286].) However, the right to present further evidence is waived unless the plaintiff also makes an offer of proof, describing the evidence and explaining how it would cure the deficiencies. (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1337 [96 Cal.Rptr.2d 364].)

If an offer of proof is made, the denial of the motion to reopen "will not be overturned when the additional evidence sought to be produced by the plaintiff is either irrelevant to the issues involved in the action (no error) or would not be sufficient to render defendants liable as a matter of law (no prejudice)." (*S. C. Anderson, Inc. v. Bank of America, supra*, 24 Cal.App.4th at p. 539.)

Here, because plaintiffs did not make an offer of proof in moving to reopen their case by proffering additional evidence they would present that would cure any deficiencies in their evidence submitted in their case-in-chief, the court properly denied their motion to reopen their case-in-chief before granting nonsuit.

Plaintiffs assert on appeal that they could have cured the deficiencies in their evidence if the court had not improperly excluded evidence they sought to introduce of Priest's alleged abuse of other students. However, because we have already concluded that the court did not improperly exclude such evidence in this case, this contention is unavailing.

## VIII. *AWARD OF ATTORNEY FEES*

Plaintiffs assert that the court erred in awarding the District attorney fees under Code of Civil Procedure section 1038 as to the Bane Act and Ralph Act claims because these claims were brought in good faith and with reasonable cause. This contention is unavailing.

### A. *Background*

In granting the District's motion for attorney fees, the court first found that on the Ralph Act claim plaintiffs "presented no evidence whatsoever, to support a finding that any aggression by [Priest] towards the two minor plaintiffs was because of their disability." As to the Bane Act cause of action, the court found that plaintiffs did not present any evidence "to support a finding that any aggression or violence by [Priest] was intended as a means of interfering with the two minor plaintiffs' exercise [of] a constitutional, or other right." Based upon this lack of evidence, the court found that plaintiffs' attorney was aware that an element of these claims was missing, and therefore these claims lacked reasonable cause.

### B. *Standard of Review*

█ Code of Civil Procedure section 1038 " 'provides public entities with a protective remedy for defending against unmeritorious litigation.' " (*Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 931 [6 Cal.Rptr.2d

874], quoting *Curtis v. County of Los Angeles* (1985) 172 Cal.App.3d 1243, 1247 [218 Cal.Rptr. 772].) The statute permits public entities to recover costs, including attorney fees, from a plaintiff who files a frivolous civil action under the California Tort Claims Act after a defendant prevails on a motion for summary judgment, directed verdict, or nonsuit. (Code Civ. Proc., § 1038; *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 853 [80 Cal.Rptr.2d 803, 968 P.2d 514].)

In order to recover fees under Code of Civil Procedure section 1038, the court must " 'determine whether or not the plaintiff, . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justiciable controversy under the facts and law which warranted the filing of the complaint.' " (*Carroll v. State of California* (1990) 217 Cal.App.3d 134, 140 [265 Cal.Rptr. 753].) "Reasonable cause" is an objective standard which asks whether any reasonable attorney would have thought the claim tenable. (*Ibid.*) "Thus, before denying a [Code of Civil Procedure] section 1038 motion, a court must find the plaintiff brought or maintained an action in the good faith belief in the action's justifiability and with objective reasonable cause." (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center, supra,* 19 Cal.4th at p. 862.)

The standard of review of an award of attorney fees under Code of Civil Procedure section 1038 is both de novo and substantial evidence. The "reasonable cause" prong is reviewed de novo, and the "good faith" prong is reviewed for substantial evidence. (*Hall v. Regents of University of California* (1996) 43 Cal.App.4th 1580, 1586 [51 Cal.Rptr.2d 387].)

In asserting that the court erred in awarding attorney fees under Code of Civil Procedure section 1038, plaintiffs merely point to the reports of alleged abuse by Priest. However, as the court found in granting attorney fees, there is no evidence creating even an inference that Priest's alleged abuse was (1) motivated by their disabilities; and/or (2) was intended to interfere with the exercise of their constitutional or statutory rights. Indeed, plaintiffs make no attempt to proffer any theory upon which they could establish a Ralph Act or Bane Act claim. Accordingly, we cannot say that the court erred in awarding the District attorney fees under Code of Civil Procedure section 1038.

## IX. *AWARD OF EXPERT WITNESS FEES*

Plaintiffs assert that the court erred in awarding defendants their expert witness costs under Code of Civil Procedure section 998 because (1) they submitted a lump sum settlement offer on behalf of all defendants; and (2) because defendants were united in interest they were not prevailing parties for the purposes of recovering expert witness fees. We reject this contention.

### A. *Background*

Defendants as a group served Austin with a Code of Civil Procedure section 998 offer to compromise in the amount of $75,000. They served an identical offer on Jessica. Following trial the court awarded defendants their expert witness costs under Code of Civil Procedure section 998 because plaintiffs did not obtain relief greater than the Code of Civil Procedure section 998 settlement offers made by defendants.

### B. *Analysis*

Code of Civil Procedure section 998 provides in part: "(a) The costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section. [¶] (b) Not less than 10 days prior to commencement of trial or arbitration . . . of a dispute to be resolved by arbitration, any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. The written offer shall include a statement of the offer, containing the terms and conditions of the judgment or award, and a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted. Any acceptance of the offer, whether made on the document containing the offer or on a separate document of acceptance, shall be in writing and shall be signed by counsel for the accepting party or, if not represented by counsel, by the accepting party. [¶] . . . [¶] (2) If the offer is not accepted prior to trial or arbitration or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the trial or arbitration. [¶] . . . [¶] (c)(1) *If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. . . .*" (Italics added.)

 Under that section, if two or more defendants are sued on a theory of joint and several liability, each is potentially liable for the full amount of any judgment, and a joint offer by the defendants under Code of Civil Procedure section 998 is effective because it is deemed an offer by each defendant that judgment may be taken against each of them. (*Brown v. Nolan* (1979) 98 Cal.App.3d 445, 451 [159 Cal.Rptr. 469]; see also *Winston Square Homeowner's Assn. v. Centex West, Inc.* (1989) 213 Cal.App.3d 282, 294 [261 Cal.Rptr. 605]; *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 114 [30 Cal.Rptr.2d 486].) However, it has been stated in dicta that "in post-Proposition 51 cases, where each defendant is only jointly liable for the plaintiff's economic damages but severally liable for noneconomic damages in proportion to that defendant's degree of wrongdoing

[citation], the validity of such an offer is questionable." (*Taing v. Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579, 584 [11 Cal.Rptr.2d 820].)

No post-Proposition 51 case has resolved the question directly as to whether an offer from multiple defendants that are not jointly and severally liable, and that is not apportioned among the individual defendants, is valid. However, the question has been addressed with regard to a *plaintiff's* offer to multiple defendants that are not jointly and severally liable. In a case subject to Proposition 51, where the defendants have potentially varying noneconomic damage liability, a valid Code of Civil Procedure section 998 offer must specify the amount the plaintiff seeks from each defendant. (*Burch v. Children's Hospital of Orange County Thrift Stores, Inc.* (2003) 109 Cal.App.4th 537, 547 [135 Cal.Rptr.2d 404].) This rule was summarized by one commentator as follows: "In multidefendant cases, the rule barring comparative indemnity claims against a 'good faith' settling defendant [citation] and the Prop[osition] 51 elimination of joint and several liability for noneconomic damages [citations] play a significant role in the determination of each defendant's ultimate liability. Consequently, a plaintiff's [Code of Civil Procedure section] 998 offer to joint defendants having *potentially varying liability* must specify the amount plaintiff seeks from *each defendant*. Otherwise, there is no way to determine whether a subsequent judgment against a particular nonsettling defendant is 'more favorable' than the offer." (Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2004) ¶ 4:163.2g, p. 4-49 (rev. #1, 2006), first italics added.) As stated by a different practice guide, " 'Thus, a lump-sum settlement offer made to several defendants whose liability may be apportioned (i.e., *not* jointly liable) must state [plaintiff's] position as to each defendant's share or percentage of the settlement demand." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2004) ¶ 12:610.2, p. 12(II)-28 (rev. #1, 2006).)

Here, it is undisputed that plaintiffs were seeking only noneconomic damages, and, as such, ordinarily the defendants were only severally liable for the plaintiffs' damages. However, in this case, because the District is the employer of the individual defendants, if plaintiffs prevailed against any of them, the District would have been liable for the judgment. Thus, plaintiffs were not prejudiced or misled by an offer made collectively by all defendants. Moreover, by joining in a group offer, each defendant assumed the risk that if plaintiffs' recovery against any one defendant exceeded the group offer, plaintiffs would be able to recover their Code of Civil Procedure section 998 costs against all defendants. The court did not err in awarding defendants their expert witness costs under Code of Civil Procedure section 998.

## DISPOSITION

The judgment and orders are affirmed.

Haller, J, and Irion, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 18, 2007, S152906.