Filed 12/29/16  Certified for partial publication 1/25/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KENNETH SIMMONS,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>THE CITY OF SAN DIEGO, et al.,<br><br>        Real Parties in Interest. | D070734<br><br>(San Diego County<br> Super. Ct. No. 37-2015-00012269-CU-CR-CTL) |

PROCEEDINGS in mandate after the superior court granted summary adjudication in favor of real parties in interest.  Gregory W. Pollack, Judge.  Petition granted in part, denied in part.

Sias | Carr, Peter L. Carr, IV, NaShaun L. Neal; Filer | Palmer and Justin A. Palmer for Petitioner.

No appearance for Respondent.

Jan I. Goldsmith, City Attorney, Daniel F. Bamberg, Assistant City Attorney, Keith W. Phillips, Deputy City Attorney, for Real Parties in Interest.

San Diego police officers Carlos Robles and Kyle Williams initiated contact with plaintiff Kenneth Simmons for being in a city park after it closed and for riding a bicycle in the dark without a headlight.  Simmons fled.  The officers pursued, detained, and searched him, finding a plastic baggie containing rock cocaine.  Simmons was charged with possessing a controlled substance, using a weapon in a fight, and resisting an officer.  A jury was unable to reach a verdict on the drug possession count and acquitted him on the others.

Simmons then brought a civil action against the City of San Diego (the City) and the officers (collectively, defendants) asserting (among others) claims under the Tom Bane Civil Rights Act (Bane Act; Civ. Code,[1] § 52.1), which authorizes civil actions by individuals whose federal or state rights have been interfered with by "threat, intimidation, or coercion"; and under the Ralph Civil Rights Act of 1974 (Ralph Act; § 51.7), which authorizes civil actions by individuals subjected to violence or intimidation because of their membership in a protected class.  Simmons, who is African-American, alleged the officers violated these statutes by using excessive force during his arrest, pulling his underwear into a "wedgie" while searching him, and conducting a nonconsensual physical body cavity search of his rectum.

---

[1]     Undesignated statutory references are to the Civil Code.

2

Defendants moved for summary adjudication of the Bane Act and Ralph Act claims.  The trial court granted the motion.  Simmons filed a petition for writ of mandate, which defendants opposed.  We issued an order to show cause why we should not grant the requested relief.  For reasons we will explain, we grant the petition as to Simmons's Bane Act claim, but deny it as to his Ralph Act claim.

FACTUAL AND PROCEDURAL BACKGROUND

I.  *The Underlying Incident and Simmons's Criminal Case*[2]

On the night of May 17, 2014, San Diego police officers Robles and Williams were patrolling Memorial Park (the park).  They observed Simmons straddling his bicycle next to four Hispanic males who were standing by a park bench.  The officers activated the emergency lights on their patrol vehicle and told another group of people that the park was closed.  Simmons fled on his bicycle and the officers pursued him in their vehicle.  After 10 to 20 seconds, Williams exited the vehicle and pursued Simmons on foot.  When Williams caught up about 10 seconds later, he "bear hug[ged]" Simmons to the ground.[3]  The officers handcuffed Simmons, searched him, and found a baggie containing rock cocaine.  Simmons was arrested and later charged with possessing a controlled substance (Health & Saf. Code, § 11350, subd. (a)); resisting an executive officer (Pen. Code, § 69); using a deadly weapon in a fight (Pen. Code, § 417, subd.

---

[2]    We take judicial notice of the Superior Court's records in *People v. Kenneth Dewayne Simmons* (Super. Ct. San Diego County, No. SCD256148).  (Evid. Code, §§ 452, subd. (d), § 459, subd. (a).)

[3]    Williams testified Simmons pulled a pocketknife on him but he was able to elbow it out of Simmons's hand.

(a)(1)); and willfully resisting, delaying, or obstructing a peace officer (Pen. Code, § 148, subd. (a)(1)).

Simmons moved to suppress the prosecution's evidence on the basis the officers' warrantless detention and search of him was presumptively unreasonable. The motion was denied.

In October 2014, a jury hung on the drug possession count and acquitted Simmons on the remaining counts. During deliberations in the criminal trial, the jury submitted the following question: "If the defendant willfully resisted a peace officer while the officer was lawfully performing his duties (and the defendant knew the officer was performing his duties and was an officer), *but the officer subsequently performed his duties unlawfully during the same encounter*, is the defendant guilty of Pen. Code § 148 in Count 2 (the lesser offense [to resisting an executive officer]?" (Italics added.)

## II. *Simmons's Civil Complaint*

In April 2015, Simmons filed a civil lawsuit against the City, the San Diego Police Department,[4] and the officers, asserting causes of action for battery (officers only), sexual assault (officers only), violating the Bane Act (all defendants), violating the Ralph Act (all defendants), intentional infliction of emotional distress (all defendants), negligent supervision (City only), and negligence (all defendants). His operative second amended complaint alleges the following narrative.

---

4    Simmons eventually dismissed the department on the basis it is not an entity separate from the City.

About 10:20 p.m. on May 17, 2014, Simmons was lawfully riding his bicycle and listening to music in the park when he was profiled by Robles and Williams. Without reasonable suspicion or probable cause, the officers "allegedly trailed behind [him] to inform him about the need of using a bike light [with] which his bike was already equipped." Simmons did not hear the officers trailing behind him because he was wearing earphones and listening to music. The officers approached Simmons without reasonable suspicion or probable cause and accused him of attempting to evade them because he allegedly possessed drugs. "After [Simmons] repeatedly denied that he possessed drugs, [the officers] then told [him] that they believed that he inserted the drugs [into] his rectum and that they were going to retrieve them with their hands. [Simmons] begged [the officers] not to violate him in that way." The officers "conducted anal cavity searches on [Simmons]'s body without his consent on at least two separate occasions: once while on the side of the street and [again] when [the officers] placed him in the patrol vehicle." The officers also hit Simmons repeatedly in the head and torso "causing multiple contusions and partially causing [Simmons] to defecate on himself."

In support of his Bane Act claim, Simmons alleged the officers "violated [his] right to be free of unreasonable searches" by conducting warrantless and nonconsensual physical body cavity searches. Invoking the statutory language, Simmons alleged the officers (1) *threatened* "that they were going to perform an illegal anal cavity search . . . and carried out that threat"; (2) *intimidated* Simmons "by handcuffing him, punching and kicking him in the stomach and face and pulling down his pants prior to forcefully conduc[t]ing an anal cavity search . . ."; and (3) *coerced* him when he "was held against

his will and beaten by [the officers] while they forcefully conducted an anal cavity search on him." Simmons alleged the officers' conduct was "deliberate and spiteful and specifically aimed [at] depriving him of his [F]ourth [A]mendment right[s]."

In support of his Ralph Act claim, Simmons alleged the officers interfered with the exercise or enjoyment of his statutory and constitutional rights "by the unreasonable use of excessive force perpetrated on him in a racially motivated manner."

III.  *Defendants' Summary Adjudication Motion*

The City and the officers moved for summary adjudication of Simmons's Bane Act and Ralph Act causes of action.

A.  *Defendants' Moving Papers*

1.  *Bane Act Claim*

Defendants argued they were entitled to summary adjudication of Simmons's Bane Act claim because no liability arises under the act when an arrest is lawful. They asserted the officers had probable cause to arrest Simmons, were entitled to use force in doing so, and did not threaten Simmons beyond telling him to stop resisting.

Defendants maintained the officers had probable cause to detain Simmons for three reasons. First, "for being in a City park after it was closed." They submitted evidence showing (1) the officers encountered Simmons at approximately 10:20 p.m.; (2) the park closed at 10:00 p.m.; and (3) it is a violation of the San Diego Municipal Code to be in a city park after it has closed.

Second, defendants argued the officers "had separate probable cause to detain [Simmons] for riding a bicycle in a time of darkness without a light in violation of

6

Vehicle Code section 21202."[5]  Each officer submitted a declaration stating the following:  "I saw [Simmons] riding his bicycle at approximately 10:20 p.m.  I did not see any lamp emitting white light on the ground or sidewalk in front of Simmons as he was riding a bicycle that night.  Even after arresting [Simmons], I did not see a lamp emitting white light on Simmons'[s] bicycle or on Simmons himself."  Defendants submitted as an exhibit a video captured by Williams's body-worn camera during the incident to show that it was dark when Simmons was riding his bicycle.

Third, defendants asserted the officers "had probable cause to detain [Simmons] for willfully resisting, delaying and obstructing a peace officer in violation of Penal Code section 148."  The officers' declarations stated:  "We activated our patrol vehicle's overhead blue and red lights while trailing behind Simmons on his bicycle to stop him. Simmons looked back, did not yield and kept pedaling his bicycle away from us as fast as he could.  [Simmons] proceeded to ride his bicycle into a dark alleyway.  When we finally caught Simmons, he fought our efforts to arrest and search him, presumably to prevent us from searching his right front pocket where we found his crack cocaine.  The body camera video footage shows our search of [Simmons] and our removing a baggie with crack cocaine from Simmons['s] right front coin pocket . . . ."  Although the officers

_____

[5]    The version of Vehicle Code section 21201, subdivision (d)(1) in effect on May 17, 2014 provides in part:  "A bicycle operated during darkness upon a highway, a sidewalk . . . , or a bikeway . . . , shall be equipped with [¶] . . . [¶] [a] lamp emitting a white light that, while the bicycle is in motion, illuminates the highway, sidewalk, or bikeway in front of the bicyclist and is visible from a distance of 300 feet in front and from the sides of the bicycle."

found drugs in Simmons's possession, they did not cite suspicion of drug possession as a basis for probable cause to detain him.

Defendants maintained that because the officers had probable cause to detain or arrest Simmons, they were "entitled to use coercion and threats and intimidation" in doing so. They nevertheless denied making any threats (beyond telling Simmons to stop fleeing and resisting) or using excessive force (as demonstrated by the footage from the body-worn camera).

Defendants' motion did not reference Simmons's allegations that the officers had conducted nonconsensual physical body cavity searches.

### 2. *Ralph Act Claim*

Defendants argued Simmons's Ralph Act claim failed because he had no evidence the officers' conduct was racially motivated. The officers' declarations asserted they "never considered Simmons'[s] race, color, ancestry, or national origin when [they] made [their] decision to contact Simmons and to ultimately detain and arrest him." Defendants also lodged Simmons's interrogatory responses in which he (1) identified the officers as the only persons having knowledge of why they arrested him; and (2) stated he was "unable to read the mind[s] of" the officers "and as such, is unable to answer" the interrogatory asking him to "[d]escribe in detail all reasons why [the officers] arrested [him]." Defendants also cited as an admission the allegation in Simmons's complaint that the officers "trailed behind [him] to 'inform him about the need of using a bike light.' "

### B. *Simmons's Opposition*

#### 1. *Bane Act Claim*

Simmons argued his Bane Act claim survived summary adjudication because factual disputes existed regarding whether the officers had probable cause to arrest him and whether they engaged in the requisite coercion, intimidation, or threats.

Regarding probable cause for the municipal code violation, Simmons did not dispute that (1) he was in the park at about 10:20 p.m., (2) the park had closed at 10:00 p.m., and (3) it was a violation of the municipal code to be in a city park after it closed. However, he cited testimony from Williams's deposition in which Williams said he considered Simmons free to ride his bicycle away when the officers began to drive toward him, thereby "[i]mplicit[ly] . . . admi[tting] . . . the officers did not have probable cause to arrest" Simmons for the municipal code violation.

As to probable cause for the Vehicle Code violation, Simmons did not dispute the requirements of the Vehicle Code or that he was riding his bicycle in the dark. However, he cited his deposition testimony to establish that he had a headlight "on the handlebars, like [he] always put it." He acknowledged the body-worn camera footage did not show such a light, but he surmised it fell off during the pursuit. Simmons also cited the officers' deposition testimony to establish that, at the precise moment the officers began

9

pursuing him for an alleged Vehicle Code violation, neither officer could determine whether Simmons had a headlight on the front of his bicycle.[6]

Regarding probable cause for resisting the officers, Simmons explained he initially fled when he saw the officers because of an incident that occurred near the park a few weeks earlier. Simmons said he was riding his bicycle with a friend when Robles and his partner (possibly Williams) conducted a nonconsensual search of Simmons and beat him for two to three minutes in the back of their patrol vehicle before releasing him without charges. Thus, when he saw the officers on May 17, he feared for his life and rode off as fast as he could.

---

[6] Williams initially testified in his deposition that he saw the bicycle's handlebars as Simmons rode off: "Q: So you are behind Mr. Simmons as he's riding his bike? [¶] . . . [¶] A: Correct. [¶] . . . [¶] Q: Okay. So you had no idea whether there was a bike light violation at that time, right?" [¶] A: Well, from my side of the police car, I remember it being offset. And from the passenger's seat, I could see onto the front of the bicycle where, for the California law, where the light should be attached to it."

However, after being shown a transcript of his testimony from Simmons's criminal trial, Williams revised his testimony: "Yeah, it refreshes my memory. I know from reading my testimony that I didn't see the bicycle light until we got in behind him."

Robles testified in his deposition that he was not able to see the front of Simmons's bicycle as he rode off: "Q: Okay. And when [Simmons] . . . turned away and . . . started pedaling it away . . . from you, were you able to see the front of his bike? [¶] A: Not at the point that he was pedaling away from us, because we were, I would say, maybe 15 feet away. [¶] Q: Okay. So if he had . . . activated lights on his bike when he started pedaling away, you would not have been able to see that, correct? [¶] . . . [¶] A: I would be able to see the rear light but not the front light. [¶] . . . [¶] Q: Okay. And do you recall seeing that there were three lights on the bike? [¶] A: I did not see any lights lit on his bike. [¶] Q: Oh, okay. But I'm saying, did you see that there were three lights on his bike? [¶] A: Not lit. That's the best answer I could give you. So if they were on his bike, I do not recall seeing lights . . . lit on his bike."

Apart from the lawfulness of his arrest, Simmons argued the officers engaged in coercive, intimidating, and threatening conduct "independent from" and "separate from the initial arrest." Citing his own deposition testimony (and other evidence), Simmons's opposition provided the following narrative.

When Simmons realized after riding away on his bicycle that the officers were pursuing him, he stopped in an alleyway, inserted a baggie containing rock cocaine into his rectum, and kneeled on the ground. Williams grabbed him, threw him to the ground, and punched him. As Williams attempted to handcuff Simmons without explaining that he was under arrest, a "struggle ensued" during which Williams struck Simmons several times. Robles caught up and joined in, striking Simmons in the face, kicking him in the back, and hitting him in the head several times with a flashlight. The officers handcuffed Simmons and removed a knife from his waistband. Williams put on black latex gloves and the officers began to search Simmons. During the search, Robles asked Simmons if his friend from the previous police encounter was in the park that night.

Robles then escorted Simmons down the alley toward the patrol vehicle. On the way, Robles said, "We're going to do a cavity search on you." Simmons responded, "No, I'm not a [Fourth Amendment] waiver, you can't do that." Williams stated, "Yes, we are." Robles leaned Simmons on the hood of the patrol vehicle, but Simmons fell to the ground. Robles then got on top of Simmons and repeatedly struck him in the abdomen. Williams pressed Simmons's head against the concrete.

After Simmons repeatedly denied that he possessed any drugs, the officers stated they believed he inserted them in his rectum. The officers searched Simmons's pockets

11

and removed a plastic baggie. Williams pulled Simmons's underwear into a "wedgie" and inserted an unknown number of fingers into Simmons's rectum. Robles also penetrated Simmons's rectum. Simmons said the officers penetrated him as many as four times and to a depth that hurt and caused him to defecate a little in his underwear.

Simmons submitted excerpts from the deposition of Denise Phillips, the mother of his child. She said she heard Simmons yelling for help during the incident and responded to the scene. She saw that Williams had his gloved "hand near [Simmons's] butt crack" and "was searching around his private areas." She said Robles told her Simmons is "not as innocent as [you] fuckin' think he is."

In his opposition, Simmons argued that the facts in this narrative established the coercion, intimidation, or threats necessary to establish a Bane Act claim. Specifically, he argued the officers *coerced* him by (1) punching him several times when he posed no danger to the officers, (2) "pull[ing] [his] underwear into a wedgie," and (3) Williams "plac[ing] his hand into Simmons'[s] rectum to perform an anal cavity search. This conduct was not necessary to perform a search incident to arrest." Simmons argued Robles *intimidated* him by asking whether his friend from their previous encounter was among the group of men at the bench, which Simmons asserted "was a dog whistle to remind Simmons about being roughed up by [Robles] and his partner . . . ." Finally, Simmons argued the officers *threatened* him by (1) telling him they were going to perform a physical body cavity search, to which he objected, and (2) pulling his underwear into a wedgie and saying they were going to do a physical body cavity search.

12

## 2. *Ralph Act Claim*

Simmons argued his Ralph Act claim survived summary adjudication because, apart from the officers' self-serving declarations, circumstantial evidence indicated they were racially motivated. That is, the officers pursued Simmons—the only African-American male in the group of men at the bench—when "there was no reason for the officers to follow Simmons over the [four] Hispanic" men. Thus, he reasoned, "a reasonable jury could find based on targeting the sole African-American in a group, that the officers[] singled-out Simmons because of his race."

Simmons argued the inference of racial motivation was bolstered by "his past experiences with racial profiling by the San Diego Police Department." Phillips testified in her deposition that she had observed such profiling of Simmons and had experienced it herself.

Finally, for the same reasons he argued the officers lacked probable cause to arrest him, Simmons argued the officers could not use the alleged municipal code or Vehicle Code violations as post hoc justifications for singling him out.

## C. *Defendants' Reply*

In reply, defendants reiterated their argument there was no Bane Act violation because the officers had three grounds of probable cause to arrest Simmons and, therefore, were entitled to use reasonable force to overcome his resistance and take him into custody. Further, they reasoned that because the officers were entitled to arrest Simmons, they were entitled to search him incident to arrest. Finally, defendants argued there was no factual issue regarding whether a physical body cavity search occurred:

13

"The video does not lie and does not create a triable issue of fact because it shows the officers did not search Simmons'[s] rectum."

Defendants argued there were no triable issues of fact on the Ralph Act claim because it was undisputed Simmons was the only person by the bench who was on a bicycle and who "rode away as fast as he could." They clarified that although the officers could not immediately tell that Simmons did not have a headlight on his bicycle, probable cause arose "after Simmons fled, riding away as fast as he could, [when] the Officers saw he did not have a forward facing bicycle light at night." (Underscoring omitted.)

D. *Trial Court's Ruling*

The trial court construed the Bane Act as providing that so long as the officers had probable cause to arrest Simmons, no Bane Act liability could arise from their conduct in association with that lawful arrest. The court based its interpretation entirely on *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968 (*Bender*) and the cases discussed therein.

The court then found the officers "had probable cause to detain Simmons, or even arrest him, based upon either or both the Municipal Code violation and the Vehicle Code violation."[7] Regarding the former, the court found it was undisputed that Simmons violated the municipal code by being in the park after it closed. Regarding the latter, the court noted the officers' testimony they did not see light emitting from the front of Simmons's bicycle, and observed that the video showed there was no light on the bicycle

---

[7] The court remarked that its probable cause finding "shouldn't shock anyone" in light of the denial of Simmons's suppression motion in his criminal case.

14

when the officers finally apprehended Simmons.  Significantly, the court found that Simmons's testimony that he had a headlight on his bicycle did not create a triable issue because it did not establish the light, "if, indeed, he even had one, was such that it could provide illumination from 300 feet away as required . . . ."  The court made no findings with respect to Simmons's assertion the officers had conducted nonconsensual physical body cavity searches.

The court also found Simmons's Ralph Act claim failed.  Defendants met their initial burden when the officers "den[ied] that race played any role in their decision to contact, detain, or arrest plaintiff.  Simmons, himself, concede[d] that he [did] not know what was going on in the mind[s] of Williams and Robles."  As for Simmons's theory that the officers singled him out of a group containing four Hispanic males because he was the lone African-American, the trial court explained "it was only Simmons, on a bicycle, who sped off as fast as he could upon witnessing [the officers'] arrival.  Under these circumstances, it cannot be said that [the officers'] decision to follow Simmons was racially motivated.  That Simmons is African-American and Williams and Robles are not, alone, does not give rise to a reasonable inference that Williams'[s] and Robles'[s] actions were substantially motivated by race."

E.  *Writ Proceedings*

Simmons filed a petition for writ of mandate seeking an order compelling the trial court to vacate its summary adjudication ruling.  Defendants filed an informal response. We issued an order to show cause why we should not grant the relief requested.  Our order provided that, "[a]bsent objection . . . , the informal response filed by [defendants]

15

will be deemed [the respondent court's] return to the order to show cause. In the event of an objection, [defendants] may file a return to the order to show cause . . . . [Simmons] may file a reply . . . ." Neither defendants nor Simmons submitted any further briefing.

DISCUSSION

I. *Summary Adjudication Principles*

A defendant moving for summary adjudication "bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*); *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859 (*Serri*).) To meet this burden, the defendant must show one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Ibid.*) The defendant may make this showing by relying on the plaintiff's "factually devoid discovery responses." (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 590.) If the defendant does not present sufficient evidence to meet its initial burden, the court must deny the summary adjudication motion. (*Aguilar*, at p. 850.)

Once the defendant satisfies its burden, " 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' " (*Aguilar, supra*, 25 Cal.4th at p. 849.) The plaintiff may not rely upon the mere allegations or denials of his pleadings to show a triable issue of material fact exists. (*Ibid.*)

We review a summary adjudication de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60.) "In practical effect, we assume the role of a trial court and apply the

16

same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of San Diego* (1998) 61 Cal.App.4th 1073, 1079.) Thus, we apply the same three-step analysis trial courts use: "First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact." (*Serri, supra*, 226 Cal.App.4th at pp. 858-859.) In doing so, "[w]e liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.) Because "[s]ummary judgment is a drastic measure that deprives the losing party of a trial on the merits . . . [,] [a]ny doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (*Molko v. Holy Spirit Assn*. (1988) 46 Cal.3d 1092, 1107, superseded by statute on other grounds as stated in *Aguilar, supra*, 25 Cal.4th at p. 853, fn. 19.)

## II.  *Simmons's Bane Act Claim*

### A.  *Bane Act Overview*

The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the

17

Constitution or laws of this state." (§ 52.1, subd. (a); see §52.1, subd. (b).)[8] Although initially enacted "to stem a tide of hate crimes" (*Jones v. Kmart Corp*. (1998) 17 Cal.4th 329, 338), "a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion" (*Austin B., supra*, 149 Cal.App.4th at p. 882; see *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 841-843). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." (*Austin B*., at p. 883.)

*Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947 (*Shoyoye*) clarified that the Bane Act requires that the challenged conduct be intentional. There, the plaintiff sued a county after he was *lawfully* arrested but inadvertently overdetained by 16 days due to a paperwork error. (*Shoyoye*, at p. 951.) Based on "multiple references to

---

[8]     Section 52.1 provides in part: "(a) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . . [¶] (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages . . . ."

18

violence or threats of violence" in other subdivisions of section 52.1, the court concluded the statute "was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful." (*Id.* at p. 959.) The court also "conclude[d] that where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in [c]ounty jail, the statutory requirement of 'threats, intimidation, or coercion' is not met. The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself." (*Ibid.*)

*Bender, supra*, 217 Cal.App.4th 968—the sole case cited in the trial court's summary adjudication ruling—applied *Shoyoye* in the context of an *unlawful* arrest accompanied by the use of excessive force. There, the plaintiff sued a sheriff's deputy and county after he was arrested without probable cause and beaten and pepper sprayed while handcuffed and not resisting arrest. (*Id.* at pp. 972-973.) The jury found for the plaintiff on his Bane Act claim, and the trial court denied the defendants' posttrial motions. (*Bender*, at pp. 975-976.) The court of appeal affirmed, "conclud[ing] the Bane Act does not require a showing of a violation of a constitutional right separate from the Fourth Amendment violation . . . ." (*Id.* at p. 977, fn. 4.) The court explained "the Bane Act applie[d] because there was a Fourth Amendment violation—an arrest without probable cause—accompanied by the beating and pepper spraying of an unresisting plaintiff, i.e., *coercion that is in no way inherent in an arrest, either lawful or unlawful*." (*Id.* at p. 978, italics added.) The court "emphasize[d]," however, that this was *not* "a case involving the use of excessive force during an otherwise *lawful* arrest based on

19

probable cause." (*Ibid.*, italics added.)  The court concluded it "need not weigh in on th[at] question . . . ." (*Ibid.*)

The parties have not cited, and we have not found, a California case that addresses the precise question presented here:  whether a Bane Act claim arises from excessive force or an unlawful search following a *lawful* arrest.  However, the majority of federal district courts in California have held that "[w]here Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force."[9]  (*Dillman v. Tuolumne County* (E.D. Cal., May 7, 2013, No. 1:13-CV-00404-LJO-SKO) 2013 WL 1907379, at *21 [applying rule to "unreasonable strip search"]; see *Morse v. County of Merced* (E.D. Cal., June 13, 2016, No. 1:16-CV-00142-DAD-SKO) 2016 WL 3254034, at *12 [this rule is "the weight of authority among District Courts in California"]; *Mann v. County of San Diego* (S.D. Cal. 2015) 147 F.Supp.3d 1066, 1092 ["the majority of courts" follow this rule].)

## B.  *Analysis*

We need not determine whether a plaintiff can establish Bane Act liability without showing the challenged conduct is separate and independent from inherently coercive underlying conduct (like an arrest).  Even assuming the officers had probable cause to

---

[9]    "Because many Ralph Act and Bane Act claims are alleged along with a federal claim under 42 U.S.C.A. § 1983 or one of the other federal civil rights statutes, it is quite common for claims under the Ralph Act and Bane Act to be filed in or removed to federal court."  (Cal. Civil Practice (Thomson Reuters 2011) Civil Rights Litigation, § 3:28.)

20

arrest Simmons, the complained-of conduct asserted here—multiple nonconsensual, roadside, physical body cavity searches—is necessarily *intentional* conduct that is *separate and independent* from a lawful arrest for being in a park after it closed, for riding a bicycle in the dark without a headlight, or for resisting a peace officer. Defendants do not contend otherwise.[10] Indeed, their response to Simmons's writ petition *makes absolutely no mention of the physical body cavity searches*. Thus, so long as Simmons has shown that a triable issue of fact exists with respect to whether the searches occurred, summary adjudication of his Bane Act claim is not proper.

Although defendants make no mention of the searches on appeal, they argued below that Williams's body-worn camera footage "does not lie and does not create a triable issue of fact because it shows the officers did not search Simmons'[s] rectum." We have reviewed the video and find that it is not so conclusive as to entitle defendants to summary adjudication. It begins shortly after Williams bear-hugged Simmons to the ground and runs continuously for eight minutes 44 seconds until the officers placed him in the patrol vehicle. About one minute into the video, Williams puts on black latex gloves. At about the 3:40 mark, Simmons pulls the left side of his underwear into a wedgie and Robles grabs the underwear with his bare hand to stop him. One officer asks, "Did you get it?" The other responds, "I think he shoved it in his ass." Williams then pulls the right side of Simmons's underwear into a wedgie (exposing both sides of

---

10      Nor do defendants attempt to explain how the alleged searches complied with the strict statutory regulations that govern physical body cavity searches. (See, e.g., Pen. Code, § 4030, subd. (j) ["A physical body cavity search shall be conducted under sanitary conditions, and only by [specified *medical* personnel]."].)

21

Simmons's buttocks) and manipulates the upper part of the underwear with his hand. At about the 5:00 mark, Williams removes a plastic baggie from Simmons's right front coin pocket. One officer asks, "Is it an empty bag? Or have you checked?" There is no audible response. At about the 6:55 mark, Williams tells Simmons, "Stop trying to shove it up you." Simmons responds, "I'm not. I'm not trying to shove nothing." The officers then stand Simmons up, search his sweatshirt, and place him in the patrol vehicle. The video does not appear to depict either officer digitally penetrating Simmons's rectum as he claims occurred. However, the video does not constantly display both officers' hands and Simmons's buttocks, and does show the officers manipulating his underwear using their hands in the vicinity of his partially exposed buttocks. Thus, we cannot find the video *conclusively* establishes that no physical body cavity searches or other potentially actionable conduct occurred. Because Simmons established a triable issue of fact on this issue, the trial court erred in granting summary adjudication on his Bane Act claim.

### III. *Ralph Act*

Simmons contends the trial court also erred by summarily adjudicating his Ralph Act claim because a factual issue exists regarding whether the officers' conduct was racially motivated. We disagree.

The Ralph Act provides that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of," among other things, their race. (§§ 51.7,

51, subd. (b).)[11] The elements of a Ralph Act cause of action are: (1) the defendant committed a violent act against the plaintiff or his property; (2) a motivating reason for that conduct was his perception of the plaintiff's race; (3) the plaintiff was harmed; and (4) the conduct was a substantial factor in causing the plaintiff's harm. (*Austin B., supra*, 149 Cal.App.4th at pp. 880-881; see CACI No. 3063.) We are concerned here with the second element.

Defendants carried their initial summary adjudication burden by submitting (1) the officers' declarations asserting they did not consider Simmons's race in deciding to detain or arrest him; and (2) Simmons's discovery responses proclaiming his inability to read the officers' minds and identifying them as the only people who know why they arrested him. Thus, the burden shifted to Simmons to show the existence of a triable issue of material fact. (*Aguilar, supra*, 25 Cal.4th at p. 849.) He failed to do so.

First, we are unpersuaded that the officers' pursuit of Simmons over the four Hispanic males at the park bench establishes racially motivated disparate treatment. Although all five men were in the park after it closed and thus the officers would have

---

11 Section 51.7, subdivision (a) provides in part: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics."

Section 51, subdivision (b) provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, *race*, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Italics added.)

23

been justified in detaining any or all of them, it is undisputed that Simmons was the only one on a bicycle and the only one who fled from the officers. Williams testified in his deposition that based on his "training and experience, most people who run end up having warrants for their arrest or they don't want any sort of police contact."

Simmons's characterization of the officers' pursuit of him for a Vehicle Code violation as a post hoc rationalization is unavailing. The officers' declarations assert they "did not see any lamp emitting white light on the ground or sidewalk in front of Simmons as he was riding a bicycle," and they found no light on his bicycle or body when they arrested him. Simmons's suggestion that the officers could not immediately see the front of his bicycle from their vantage points ignores how brief the pursuit was—10 to 20 seconds—and the fact the officers spoke not only of not seeing a headlight but also of not seeing light emitted on the ground. The allegation in Simmons's complaint that the officers "trailed behind [him] to inform him about the need of using a bike light" further undermines the suggestion they were following him because of his race.[12] Finally, as the trial court noted, Simmons's testimony that he had a headlight on his bicycle did not establish that it complied with the Vehicle Code requirements.

---

[12]    Simmons objected below on the basis that "[a]llegations in the complaint [are] not evidence." However, " ' "A defendant moving for summary judgment may rely on the allegations contained in the plaintiff's complaint, which constitute judicial admissions. As such they are conclusive concessions of the truth of a matter and have the effect of removing it from the issues." [Citations.]' [Citation.]" (*Mark Tanner Construction, Inc. v. HUB Internat. Ins. Servs., Inc.* (2014) 224 Cal.App.4th 574, 586-587.)

24

Simmons also notes he and the officers are of different races. However, he cites no authority and offers no persuasive argument why this fact, standing alone, establishes the officers were racially motivated.

Finally, Simmons's assertion that he and Phillips have prior experiences being racially profiled by the police is insufficient to overcome defendants' evidence regarding *these officers*' mental state on May 17, 2014. Relatedly, Phillips's assertion that Robles told her Simmons is "not as innocent as [she] fuckin' think[s] he is" sheds no light on whether Robles's pursuit of Simmons was racially motivated.

Because Simmons failed to meet his burden of demonstrating the existence of a triable issue of fact regarding the motive element of his Ralph Act claim, the trial court properly granted summary adjudication of this claim in favor of defendants.

### DISPOSITION

Let a writ of mandate issue commanding the superior court to vacate the portion of its summary adjudication order to the extent it granted summary adjudication in defendants' favor on Simmons's Bane Act claim. The parties shall bear their own costs on appeal.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

25

Filed 1/25/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KENNETH SIMMONS,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>THE CITY OF SAN DIEGO, et al.,<br><br>        Real Parties in Interest. | D070734<br><br>(San Diego County<br> Super. Ct. No. 37-2015-00012269-CU-<br> CR-CTL)<br><br>ORDER GRANTING PARTIAL<br>PUBLICATION |

THE COURT:

The opinion in this case filed December 29, 2016, was not certified for publication. It appearing the opinion meets the standards for partial publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED in part.

IT IS HEREBY CERTIFIED that the opinion meets the standards for partial publication specified in California Rules of Court, rule 8.1105(c); and

_____

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in part in the Official Reports.

HALLER, Acting P. J.

Copies to:  All parties