Filed 1/30/26  Boos v. General Motors CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHARMAINE ANTOINETTE BOOS, Plaintiff and Appellant, v. GENERAL MOTORS LLC, Defendant and Respondent. | D086601 (Super. Ct. No.:  CVPS2303157) |

APPEAL from a judgment of the Superior Court of Riverside County, Manuel Bustamante, Judge.  Reversed.

MLG Attorneys at Law, Jonathan A. Michaels, Samuel Crocket and Drew Morgan for Plaintiff and Appellant.

Dykema Gossett, Dommond E. Lonnie and Nicholas O. von der Lancken; Bush Seyferth and Derek J. Linkous, for Defendant and Respondent.

Charmaine Antoinette Boos sued General Motors LLC (GM), alleging that injuries she sustained in a collision were attributable to defects in airbags mounted in her GM-produced car.  GM filed a motion for summary judgment.  The trial court granted the motion and entered judgment accordingly.  Boos appeals the judgment, contending the trial court erred in granting the motion.  She also contends the court abused its discretion and

engaged in misconduct in failing to rule on an ex parte application she had filed, requesting additional time to gather evidence to oppose the motion.  We agree that the court erred in granting the motion.  Hence we reverse.

## I.
## BACKGROUND

To supply context for this appeal, we begin with a brief introduction to the topic of strict products liability for manufacturing and design defects.

### A.    Strict Liability

Under California law, a manufacturer is strictly liable in tort if a defect in the manufacture or design of its product is a substantial factor in causing harm to a plaintiff while the product is being used in a reasonably foreseeable way.  (*Soule v. General Motors* (1994) 8 Cal.4th 548, 560; *Johnson v. Standard Brands Paint Co.* (1969) 274 Cal.App.2d 331, 337; *Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 554 (*Demara*).)

"A *manufacturing* defect exists when an item is produced in a substandard condition" (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1120 (*McCabe*) [italics added]), such as, for example, when the product "differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 429 (*Barker*).)  An example of such a defect is "the one soda bottle in ten thousand that explodes without explanation."  (*Id.,* at p. 428.)

"A *design* defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective."  (*McCabe, supra*, 100 Cal.App.4th at p. 1120 [italics added].)  This type of defect may be found to exist (1) "if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" (the consumer

2

expectations test) or (2) "if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of [certain] relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design" (the risk-benefit test). (*Barker, supra*, 20 Cal.3d at p. 432.) The two tests are not mutually exclusive. (*Demara, supra,* 13 Cal.App.5th at p. 554.) Nor does one test serve as a defense to the other. (*McCabe,* at p. 1120.) Thus, depending on the facts and circumstances of a case, either or both may be applied (*Demara,* at p. 554; *McCabe,* at p. 1126 ["the tests are not mutually exclusive"]. In the event that both tests are applied, "[a] product may be defective under the consumer expectation test even if the benefits of the design outweigh the risks." (*McCabe,* at p. 1120.)

As to each of the two types of defects we have discussed (manufacturing defect and design defect), a plaintiff must establish both the existence of the defect and causation. (*Demara, supra*, 13 Cal.App.5th at p. 553; *Dimond v. Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 177 (*Dimond*).) "Expert evidence, though often relied upon, is not essential to proof of a defect. Rather, that fact may be shown by circumstantial evidence." (*Moerer v. Ford Motor Co.* (1976) 57 Cal.App.3d 114, 116 (*Moerer*); see also *Till v. Big Lots Stores, Inc.* (C.D.Cal. Oct. 30, 2013, CV 12-6133-GHK (CWx) 2013 WL 12130559, *3) (*Till*) ["Defendants seem to suggest that a plaintiff must always enlist the testimony of a manufacturing or design expert to show that a product contained a defect. But a plaintiff can, in fact, rely exclusively on inferences from circumstantial evidence to prove the existence of a product defect;" citing cases].) So too may *causation* be shown by circumstantial evidence. (*Camacho v. JLG Industries Inc.* (2023) 93 Cal.App.5th 809, 817 (*Camacho*) ["[c]ausation ' "may logically and reasonably be inferred from the

circumstantial evidence" ' "].); *Dimond*, at p. 177 ["defect and proximate cause . . . may be established by circumstantial evidence"].) And courts routinely rely on such circumstantial evidence, including in instances in which a product alleged to have caused an injury is not available to inspect. (*Barker, supra*, 20 Cal.3d at p. 430 ["an injured plaintiff will frequently be able to demonstrate the defectiveness of a product by resort to circumstantial evidence, even when the accident itself precludes identification of the specific defect at fault"]; *Hughes Tool Co. v. Max Hinrichs Seed Co.* (1980) 112 Cal.App.3d 194, 201 (*Hughes*) ["[i]t is well settled that [a] design defect may be shown by circumstantial evidence in the event the product itself is destroyed"].)

With these aspects of strict products liability in mind, we now turn to the day of the collision that led to the initiation of this lawsuit.

## B. Collision and Injuries

On the day in issue Boos was driving home from a bar in Palm Springs, when her 2013 GM Cadillac XTS (the XTS) collided with a parked car. Several airbags deployed on impact, including a driver knee airbag located below the steering column of the XTS. According to Boos:

> "During the accident, my vehicle's knee airbags deployed, causing severe injuries to my lower legs. [¶ . . . ¶] As a result of the accident, my legs were covered in deep lacerations that ran from my knees to my ankles. The skin surrounding the lacerations hardened and turned black. Several of the lacerations were so deep you could put an avocado pit inside them. The tissue and muscle surrounding several of these lacerations has never grown back, leaving what look like large, deep holes, or scoops, in my lower leg tissue.
>
> "My wounds took over four months to heal. As they healed, I noticed that the skin on and around the wounds has permanently changed in color and texture. The area of skin on and around the wounds are now covered with

4

discolored bumps. The skin also swells and, because of this, I am forced to wear compression socks.

"The healing process of my leg wounds has been very painful. It frequently felt like someone poured gasoline on my legs and lit them on fire. I still have residual pain. Sometimes it feels as if someone poured acid onto a discrete, two-inch spot on my leg. Other times I will experience a deep, heavy, achy kind of pain that goes throughout my whole leg. These sensations come and go. Some days I will be afflicted by several of these painful incidents over the span of several hours. Other days, I will not experience the pains.

"My legs have not felt the same since the accident. Before the accident I was very active and I walked everywhere. For six months after the accident I was forced to use a walker to get around. While I use a cane now, my legs are still unstable and it feels like I am walking with someone else's legs."

## C.    Summary Judgment

Several months after the collision, Boos initiated this lawsuit with the filing of a complaint in which she alleged that "the airbag system of [her car had] failed to deploy properly[,] causing horrendous and gruesome fourth degree burns enveloping both of her legs, as well as other injuries," and that, "[h]ad the vehicle operated properly, [her] injuries would have been significantly less severe." The complaint named GM as a defendant, and alleged Boos's car contained manufacturing and design defects when it left GM's possession.[1]

In its motion for summary judgment, GM asserted that Boos could not establish a cause of action for a manufacturing or design defect because she

---

[1]    The complaint also alleged seven additional theories of action and named a car dealership as a defendant. But the additional theories of action and the dealership were dismissed from the complaint before the trial court ruled on GM's summary judgment motion.

could not prove the existence of a defect or that a defect had proximately caused her injuries. With regard to Boos's manufacturing defect theory of action, GM argued that:

> "The manufacturing-defect . . . claim . . . fails because [Ms. Boos] cannot prove a deviation in her XTS' airbags from other XTS airbags. Ms. Boos' apparent theory is that the knee airbag system, as designed, created a risk of chemical burns. . . . But none of Ms. Boos' medical records even diagnose her with a chemical burn. . . . And Ms. Boos did not have the 2013 Cadillac XTS, or the airbag system, inspected by an expert before the vehicle was sold to her insurer. . . . In short, she has no evidence that the knee airbag in her 2013 Cadillac XTS 'performed different[ly] from other identical units.' (*Gonzalez*, 154 Cal. App. 4th at 792.) Lacking such evidence, her manufacturing-defect claim[ ] cannot proceed."

With regard to Boos's design defect theory of action, GM argued that

> "[Ms. Boos's] central allegation . . . is that the knee airbag's design permitted gas to escape, which caused her to suffer chemical burns. . . . That is impossible. [¶] Put simply, the 2013 Cadillac XTS' knee airbag system does not emit chemicals in the direction of Ms. Boos' legs that are capable of causing chemical burning."

In support of this argument GM adduced the declaration of one of its engineers, Kathryn F. Anderson, who testified that:

> "The driver knee airbag module in the 2013 Cadillac XTS contains a 420 denier nylon knee airbag cushion that is silicone coated[, ¶] . . . mounted underneath the instrument panel . . . , and . . . does not contain any discrete vents. Therefore, when gas fills the knee airbag cushion during deployment, there are no vents in the cushion that allow gas to escape toward the driver's legs. The gas that inflates the airbag, instead, rapidly cools after deployment, which reduces the pressure in the bag (deflating it), and any minimal amount of residual gas escapes away under the instrument panel into the knee airbag module housing. . . . Therefore, gas is not directed toward the driver's legs, and

6

there is no opportunity for exposure to gases or any chemicals."

Anderson also testified that she "directed a search for claims and lawsuits related to 2013 through 2019 model year Cadillac XTS vehicles maintained in GM['s] regular course of business" and that "[t]hree claims were identified, but this present case is the only instance of an allegation of chemical burns allegedly caused by the driver knee airbag system in the 2013 through 2019 model year Cadillac XTS."

In opposition to the motion, Boos submitted a declaration in which she testified about her injuries and convalescence as quoted *ante* and to which she appended, as exhibits, a sequence of photographs depicting her lower legs over a period of 16 weeks commencing with the date of the collision.

In addition, she submitted the declaration of a medical expert, Randolph Kai Ming Wong, M.D., F.A.C.S., who testified regarding the nature of thermal burn injuries, chemical burn injuries, other types of injuries, and various features that distinguish one type of injury from the others. After reviewing Boos's medical records, meeting with her in person, and conducing a physical examination, Dr. Wong opined "to a reasonable degree of medical certainty" that "Ms. Boos' injuries, symptoms, experiences, and conditions are similar to, and consistent with, those that an individual suffering from chemical burns would experience" and that Boos had "sustained a chemical burn injury, among other injuries, to her lower legs in the . . . automobile crash."

The trial court granted the motion. In granting the motion, it acknowledged that Boos's position with respect to her manufacturing defect claim was that circumstantial evidence supported the claim, but it concluded she had not adduced any such evidence:

7

"Here, [Boos] contends that circumstantial evidence can be used to establish a defect and that the defect caused the alleged injuries. [But Boos] has not produced such evidence. The only expert testimony produced by [Boos] is that of Randolph Kai Ming Wong, M.D., F.A.C.S. Dr. Wong has not provided any testimony regarding how the airbags are designed or how [they] deviated or performed differently than units in the same product line. [Boos] has failed to demonstrate that there is a triable issue of material fact as to this cause of action."

As to the design defect claim, the court acknowledged the two tests—consumer expectations and risk-benefit—used to ascertain the existence of a defect. (See *ante*.) Then, applying only the latter test, it concluded that GM had met its burden but that Boos had not met *her* burden. "At most," the court concluded, Boos "has produced evidence that she suffered chemical burns. She has not produced any evidence that the chemical burns sustained could only have occurred or been caused due to the defective airbags."

After the motion was granted, the trial court entered judgment in favor of General Motors and against Boos. Boos timely appealed.

## II.
## DISCUSSION

Boos contends the trial court erred in granting the motion. In support of this contention, she argues the evidence before the court established a material question of fact as to the existence of a manufacturing or design defect in the driver knee airbag and as to whether injuries she sustained were attributable to such defect.

### A.  Standard of Review

Summary judgment is appropriate where the evidence shows there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) To make this showing, a defendant must establish that one or more of the elements of a cause of

8

action cannot be established or that a complete defense exists to the cause of action. (*Id*., subd. (*o*).) If the defendant succeeds in doing so, then the burden shifts to the plaintiff to show a triable issue of material fact exists as to the challenged element(s) or the proffered defense. (*Id*., subd. (p)(2).)

We review an order granting summary judgment de novo. (*Magallanes v. Doctors Medical Center of Modesto* (2022) 80 Cal.App.5th 914, 922.) As a practical matter, " 'we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' " (*Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113, 1124.) Thus, we consider all of the evidence and all of the inferences that may be drawn therefrom, construing the moving party's evidence strictly and the opposing party's evidence liberally, drawing all reasonable inferences in favor of the opposing party, and resolving all doubts or evidentiary conflicts against the moving party. (*Harding v. Lifetime Financial, Inc.* (2025) 109 Cal.App.5th 753, 760 [" ' "summary judgment cannot be granted when the facts are susceptible of more than one reasonable inference" ' "]; *McCabe, supra,* 100 Cal.App.4th at p. 1119.)

We affirm summary judgment only in instances in which all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

## B.     Manufacturing Defect

To prove a claim of strict product liability against a manufacturer under a manufacturing defect theory, a plaintiff must establish: (i) that the defendant manufactured the product; (ii) that the product contained a manufacturing defect when it left the defendant's possession; (iii) that the plaintiff was harmed; and (iv) that the product's defect was a substantial factor in causing the plaintiff's harm. (CACI No. 1201.)

9

In the papers it filed in support of its summary judgment motion, GM did not address elements (i), (iii), or (iv). Instead it pinned its challenge to Boos's ability to prove her manufacturing defect claim its contention that "there is no evidence that the 2013 Cadillac XTS performed different[ly] from other identical units, as required for such a claim to be maintained"—i.e., that the car did not contain a manufacturing defect.[2] In support of this contention, GM argued that "none of Ms. Boos' medical records even diagnose her with a chemical burn" and that "Ms. Boos did not have the 2013 Cadillac XTS, or the airbag system, inspected by an expert."

But neither of these arguments is persuasive. With regard to the first of the two arguments, it may be true that Boos's *medical records* do not reveal a diagnosis of chemical burns. But the declaration of Dr. Wong does reveal such a diagnosis. Indeed, Dr. Wong could not have been more clear when he opined "to a reasonable degree of medical certainty . . . [that] Ms. Boos sustained a chemical burn injury . . . to her lower legs in the . . . automobile crash." As to the second argument, it was not necessary to submit the car or the airbag system to an expert, as the case law permitted her to "rely exclusively on inferences from circumstantial evidence to prove the existence of a product defect" (*Till, supra*, 2013 WL 12130559, at p. *3; see also *Moerer, supra*, 57 Cal.App.3d, at p. 116) and causation (*Camacho, supra*, 93 Cal.App.5th at p. 817; *Dimond, supra,* 65 Cal.App.3d at p. 177), including in instances in which the product is not available to inspect. (*Barker, supra*, 20 Cal.3d at p. 430; *Hughes, supra*, 112 Cal.App.3d at p. 201.)

---

[2] Notably, this contention challenged Boos's ability to establish the first half (existence of a manufacturing defect) but not the second half ("when it left the defendant's possession") of element (ii) of her manufacturing defect claim.

The circumstantial evidence in this case—including the descriptions and photographs of Boos's injuries, Dr. Wong's testimony that those injuries included chemical burns, Anderson's description of the location of the driver knee airbag module and its housing, and her further testimony that "this . . . case is the only instance [she could find] of an allegation of chemical burns allegedly caused by the driver knee airbag system in the 2013 through 2019 model year Cadillac XTS" (see *ante*)—supports an inference that the airbag that deployed against Boos's lower legs at the moment of impact "differ[ed] from [GM's] intended result or from other ostensibly identical units of the same product line." (*Barker, supra*, 20 Cal.3d at p. 429.)

For the foregoing reasons, GM did not carry its burden of establishing that, as a matter of law, Boos could not prove the existence of a manufacturing defect claim; and the trial court erred in concluding otherwise.

## C.   Design Defect

As noted *ante*, depending on the circumstances, either (or both) of two alternative methods—the risk-benefit test or the consumer expectations test —may be used to prove the defect element of a claim of strict liability under a design defect theory.

To establish such a claim against a manufacturer using the risk-benefit test, the plaintiff must prove:  (i) that the defendant manufactured the product; (ii) that the plaintiff was harmed; and (iii) that the product's defect was a substantial factor in causing the plaintiff's harm.  (CACI No. 1204.)  If the plaintiff proves these three facts, then the jury must find for the plaintiff unless the defendant proves that the benefits of the product's design outweigh the risks of the design.  (*Ibid.*)  In deciding whether the benefits outweigh the risks, the jury must consider such factors as:  (a) the gravity of the potential harm resulting from use of the product; (b) the likelihood that this harm would occur; (c) the feasibility of an alternative safer design at the

11

time of manufacture; (d) the cost of an alternative design, and (e) the disadvantages of an alternative design. (*Ibid*.)

To establish a claim of strict product liability against a manufacturer using the consumer expectations test, a plaintiff must prove: (i) that the defendant manufactured the product; (ii) that the product did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way; (iii) that the plaintiff was harmed; and (iv) that the product's defect was a substantial factor in causing the plaintiff's harm. (CACI No. 1203.) The elements that GM challenged in its summary judgment motion were elements (ii) and (iv).

Applying only the risk-benefit test, the trial court concluded that GM had met its burden on summary judgment but that Boos had not met *her* burden. (See *ante*.) On appeal, Boos contends the court erred in not applying the consumer expectations test. GM counters by contending that the consumer expectations test is not applicable and that, even if it *were* applicable, it would not have been satisfied.

In determining the applicability of the consumer expectations test, we begin by noting that "[w]hether a plaintiff may proceed under the consumer expectation test or whether design defect must be assessed solely under the risk-benefit test is dependent upon the particular facts in each case." (*McCabe, supra*, 100 Cal.App.4th 1111, 1121.) This is because, as discussed *ante*, "[t]he consumer expectations test is reserved [only] for cases in which the everyday experience of the products' users permits a conclusion that the product's design violated minimum safety assumptions, and is 'defective regardless of expert opinion about the merits of the design.' " (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1374.)

12

"Whether a product is within the everyday experience of ordinary consumers and thus susceptible to a consumer expectation analysis cannot be determined by looking at the product in isolation, but rather must be considered in the context of the facts surrounding its failure." (*McCabe, supra*, 100 Cal.App.4th at p. 1122.) "Because [the consumer expectations] test applies in cases in which jurors can evaluate a product's safety design based on 'the everyday experience of the product's users' [citation], the crucial question is whether the circumstances of the product's failure may properly permit '*an inference* that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' " (*Demara, supra*, 13 Cal.App.5th at pp. 557–558.)

Although in many cases (as here) the defense argues that a product is too complex or technical for consumers to have expectations as to its design, such an argument is inapt:

> "[T]he 'inherent complexity of the product itself is not controlling' in determining whether the consumer expectation test applies. [Citation.] For example, in certain circumstances, where a technically complex product performs "so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers,' a lay jury is competent to determine whether the product's design is unsafe. [Citation.] Accordingly, the critical question is whether the "*circumstances of the product's failure* permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' [Citation.] 'If the facts permit an inference that the product at issue is one about which consumers may form minimum safety assumptions in the context of a particular accident, then it is enough for a plaintiff, proceeding under the consumer expectation test, to show the circumstances of the accident and "the objective features of the product which are relevant to an evaluation of its safety" [citation], leaving it to the fact-finder to

13

"employ '[its] own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.' " ' " *(Demara, supra*, 13 Cal.App.5th at pp. 558–559.)

Thus, by way of example, courts have applied the consumer expectations test to products as complex or technical as "a piece of heavy construction equipment that lifts loads by forks similar to the forks on a forklift" (*Demara, supra*, 13 Cal.App.5th at pp. 559–560 [discussing *Barker, supra*, 20 Cal.3d 413 (reversing judgment following nonsuit)]), buses (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112 (reversing judgment following nonsuit)]), asbestos (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220), and—as here—automobile airbags (*Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559; *McCabe, supra*, 100 Cal.App.4th 1111; see also *Bresnahan v. Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1154–1155), and have stated that "[t]here are certain kinds of accidents— even where fairly complex machinery is involved—which are so bizarre that the average juror, upon hearing the particulars, might reasonably think: 'Whatever the user may have expected from that contraption, it certainly wasn't that." (*Akers v. Kelley Co.* (1985) 173 Cal.App.3d 633, 651; see also *Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1001 [" 'a complex product "may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers" ' "].)

The importance of focusing on the circumstances of the product's failure is illustrated in a passage from the opinion in *McCabe, supra*, 100 Cal.App.4th 111, in which the Second District addressed what might have appeared to be a disparity in Second District cases involving the deployment of airbags:

14

"Deciding whether the functioning of an automobile air bag lends itself, in every circumstance, to the consumer expectation test would improperly focus on the nature of the product without regard to the circumstances of its purported failure.  For example, it may be that an '[a]ir bag[ ] [that] inflat[es] for no apparent reason while one is cruising down the road at 65 miles per hour' is the kind of product failure about which consumers may form minimum safety expectations without expert opinion[3] as to the relative merit of the design, while an air bag that deploys in a low-speed frontal collision may not be.  [Citation.]  The critical question, in assessing the applicability of the consumer expectation test, is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, *in the context of the facts and circumstances of its failure*, is one about which the ordinary consumers can form minimum safety expectations. (Soule, supra, 8 Cal.4th at pp. 568–569.)  If the facts permit such an inference, it is error to conclude the consumer expectation test is inapplicable as a matter of law."

(*McCabe, supra*, 100 Cal.App.4th at p. 1124 [discussing *Pruitt v. General Motors Corp.* (1999) 72 Cal.App.4th 1480 (affirming judgment notwithstanding trial court's refusal to instruct jury on the consumer expectations test in airbag deployment case) and *Bresnahan, supra*, 32 Cal.App.4th 1559 (reversing judgment because trial court erred in precluding plaintiff from proceeding under consumer expectations test in airbag deployment case)].)

Based on our independent review of the evidentiary record presented, resolving all factual inferences in favor of the nonmoving party as we must,

---

3    As noted *ante,* the trial court and GM fault Boos for not having submitted expert testimony regarding operation of the driver knee airbag module.  But her not having done so is of no consequence.  (*Mansur, supra,* 197 Cal.App.4th at p. 1378, fn. 4 ["since this is the consumer expectations theory of liability, we do not include . . . expert testimony in our analysis"].)

and applying the principles of design defect products liability discussed *ante*, we conclude there is sufficient evidence on the basis of which ordinary drivers of automobiles, applying their everyday experience: (1) could form minimum safety assumptions or expectations that deployment of an airbag installed in an automobile to cushion the driver from forces unleashed in a collision will not expose the driver to caustic chemical substances resulting in fourth degree burns; (2) could conclude on the basis of those expectations that the XTS's driver knee airbag module fell below those assumptions or expectations; and (3) could further conclude that this circumstance was a substantial factor in causing Boos's harm.

Although the trial court predicated its ruling on a determination that Boos "ha[d] not produced any evidence that the chemical burns sustained could only have occurred or been caused due to the defective airbags," this assessment misstated Boos's burden. As the opposing party on a motion for summary judgment, she was not required to demonstrate the absence of any alternative explanation—i.e., she was not required to demonstrate that the injuries she sustained were categorically attributable to defects in the airbags. Rather she was required only to demonstrate the existence of "a triable issue of material fact" with regard to the challenged elements. (Code Civ. Proc., § 437c, subd. (p)(2); see also *Camacho, supra,* 93 Cal.App.5th at p. 817 ["The plaintiff need not 'disprove every possible alternative explanation of the injury.' [Citation.] Causation ' "may logically and reasonably be inferred from the circumstantial evidence. [Citations.] . . . The mere fact that other inferences . . . might be drawn does not render the inference favorable to [the] plaintiff too conjectural or speculative for consideration [by the jury]." ' "]; *Dimond, supra,* 65 Cal.App.3d at p. 181

16

["'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600.) If reason and logic admit an inference to be drawn of the existence of the material facts in issue, the proponent has adduced sufficient evidence to present his case to the jury."].) This she did. Thus, GM did not meet its burden of establishing that there was no triable issue as to any material fact and that it was entitled to judgment as a matter of law; and the trial court erred in concluding otherwise.

Because we conclude that GM did not meet its burden on summary judgment of establishing that it was entitled to judgment as a matter of law, it is not necessary for us to address Boos's remaining contentions that the trial court abused its discretion and engaged in misconduct by failing to rule on her ex parte application for additional time to gather evidence with which to oppose the motion.

## III.
## DISPOSITION

The judgment is reversed. Boos is entitled to costs on appeal.


KELETY, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

17